985 A.2d 273 (2009)
In re R.N.J. & G.J., Minor Children,
Appeal of M.H., Biological Mother, Appellant.
No. 648 EDA 2008,
No. 649 EDA 2008
Superior Court of Pennsylvania.
Submitted August 31, 2009.
Filed December 18, 2009.
*274 Michael P. Marryshow, Philadelphia, for appellant.
Lester R. Zipris, and Kathleen M. Metcalfe, Public Defender, for appellees.
Elise M. Bruhl, Philadelphia, for Dept. of Human Services, Participating Party.
Jermaine Harris, Philadelphia, for Father, Participating Party.
BEFORE: BOWES, PANELLA, and KELLY, JJ.
OPINION BY BOWES, J.:
¶ 1 M.H. ("Mother") appeals from the orders entered on December 12, 2007, wherein the trial court involuntarily terminated her parental rights to her two young children, R.N.J. and G.J.[1], born June 18, 2004, and May 18, 2006, respectively, and changed the permanency goal of her two older children, M.J. and B.M.J., born September 9, 1995, and October 29, 1998, respectively, from reunification to permanent legal custody ("PLC"). After careful review, we affirm.[2]
¶ 2 The pertinent facts and procedural history may be summarized as follows. On April 1, 2005, the Philadelphia Department of Human Services ("DHS") received a general protection services report ("GPS") indicating that Mother, M.J., B.M.J., R.N.J., and two siblings were residing in an inadequate, cramped apartment with four other adults. The GPS report, which was substantiated, also alleged that Mother permitted drug activity to occur in the children's presence, and that six-year-old B.M.J. was not attending school due to insufficient immunization records. On April 4, 2005, Mother voluntarily *275 placed the children in foster care because her residence had insufficient space for the children. On April 27, 2005, the juvenile court adjudicated M.J., B.M.J., and R.N.J. dependent and awarded the agency temporary legal custody.
¶ 3 Thereafter, on May 18, 2006, Mother gave birth to G.J., who immediately tested positive for "benzo."[3] N.T., 12/12/07, at 53; DHS Exhibit 24, and 27. The ensuing GPS report was substantiated, and on May 22, 2006, DHS obtained a restraining order committing G.J. to the agency's custody temporarily. On May 31, 2006, the juvenile court adjudicated G.J. dependent. At that time, the court-approved permanency goal for all of the children was reunification. M.J. and R.N.J., who are placed together, have shared the same foster home since 2005. Likewise, B.M.J. and G.J. share the same foster home.
¶ 4 Mother's family service plan ("FSP") required her, inter alia, to: 1) attend parenting classes; 2) complete job training; 3) comply with the Clinical Evaluation Unit's recommendations; 4) attend drug and alcohol evaluation and remain drug-free for six urine screens; 5) maintain regular contact with the children; and 6) obtain suitable housing. DHS later added requirements for a mental health evaluation, domestic violence counseling, and anger management. Mother attained some of her FSP goals; she completed parenting classes and submitted to a drug and alcohol evaluation. However, her overall success was marginal. Mother did not address the housing, mental health, employment, anger management, or domestic violence issues. Moreover, although Mother visited with the children consistently, she had little interaction with the children during the supervised visitation.
¶ 5 On June 18, 2007, DHS filed petitions to involuntarily terminate Mother's parental rights to R.N.J. and G.J. and to change M.J.'s and B.M.J.'s permanency goals from reunification to permanent legal custody with their respective foster parents. Following an evidentiary hearing on December 12, 2007, the trial court entered orders involuntarily terminating Mother's parental rights to R.N.J. and G.J. pursuant to § 2511(a)(1), (2), (5), and (8), and it changed M.J.'s and B.M.J.'s permanency goals to PLC.[4]
¶ 6 Mother filed timely notices of appeal on December 19, 2007, and on January 22, 2008, she complied with the trial court's orders to file concise statements of errors complained of on appeal pursuant to Pa. R.A.P. 1925(b). On September 26, 2008, this Court granted Mother's motion to consolidate her two appeals and remanded the matter for the preparation of a supplemental Rule 1925(b) statement and a supplemental trial court opinion.
¶ 7 On appeal, Mother presents one issue *276 for our review:[5]
Whether the [trial] court erred by failing to consider the emotional needs of siblings residing in [the] same foster home where one child would visit Mother through permanent legal custody and the other child would not be allowed to visit Mother due to [the involuntary] termination of parental rights?
Mother's brief at 3.
¶ 8 Our standard of review regarding orders terminating parental rights is as follows:
When reviewing an appeal from a decree terminating parental rights, we are limited to determining whether the decision of the trial court is supported by competent evidence. Absent an abuse of discretion, an error of law, or insufficient evidentiary support for the trial court's decision, the decree must stand. Where a trial court has granted a petition to involuntarily terminate parental rights, this Court must accord the hearing judge's decision the same deference that we would give to a jury verdict. We must employ a broad, comprehensive review of the record in order to determine whether the trial court's decision is supported by competent evidence.
In re S.H., 879 A.2d 802, 805 (Pa.Super.2005). In termination cases, the burden is upon DHS to prove by clear and convincing evidence that its asserted grounds for seeking the termination of parental rights are valid.
¶ 9 We have previously stated:
The standard of clear and convincing evidence is defined as testimony that is so "clear, direct, weighty and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue." It is well established that a court must examine the individual circumstances of each and every case and consider all explanations offered by the parent to determine if the evidence in light of the totality of the circumstances clearly warrants termination.
In re J.L.C., 837 A.2d 1247, 1251 (Pa.Super.2003).
¶ 10 Requests to terminate a biological parent's parental rights are governed by 23 Pa.C.S. § 2511, which provides in pertinent part as follows:
§ 2511. Grounds for involuntary termination
(a) General rule.The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:
(1) The parent by conduct continuing for a period of at least six months immediately preceding the filing of the petition either has evidenced a settled purpose of relinquishing parental claim to a child or has refused or failed to perform parental duties. (2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.
....
(5) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency for a period of at least six months, the conditions which led to the removal or placement of the child continue to exist, the parent cannot or *277 will not remedy those conditions within a reasonable period of time, the services or assistance reasonably available to the parent are not likely to remedy the conditions which led to the removal or placement of the child within a reasonable period of time and termination of the parental rights would best serve the needs and welfare of the child.
....
(8) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency, 12 months or more have elapsed from the date of removal or placement, the conditions which led to the removal or placement of the child continue to exist and termination of parental rights would best serve the needs and welfare of the child.
....
(b) Other considerations.The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.
¶ 11 This Court applies a two-part test for termination of parental rights. In In re L.M., 923 A.2d 505, 511 (Pa.Super.2007), we stated:
Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond.
¶ 12 Mother's argument on appeal implicates only subsection (b), which focuses on whether termination of parental rights would best serve the developmental, physical, and emotional needs and welfare of the child.[6] In In re C.M.S., 884 A.2d 1284, 1287 (Pa.Super.2005), this Court stated, "Intangibles such as love, comfort, security, and stability are involved in the inquiry into the needs and welfare of the child." In addition, we instructed that the trial court must also discern the nature and status of the parent-child bond, with utmost attention to the effect on the child of permanently severing that bond. Id.
¶ 13 Herein, Mother contends that DHS did not adduce sufficient evidence in order for the trial court to make a full and proper determination of what would best serve R.N.J.'s and G.J.'s needs and welfare. *278 Specifically, Mother asserts the record is bereft of evidence concerning the nature of the children's respective relationships with her and the effect that sharing a foster home with a sibling who maintains a bond with her would have on their welfare and development. See Mother's brief at 12-13. Essentially, Mother contends that since she will continue to have court-ordered visitation with M.J. and B.M.J., but not with R.N.J. and G.J., the resulting intra-foster-home relationships will be unhealthy. Mother speculates that R.N.J. and G.J. will resent their respective foster parents for preventing their visits with Mother, and the children will feel guilty for their non-involvement with the remaining family members. Id. at 8. Mother characterizes this as "a disastrous result." Id. She also posits that the situation might cause friction among the siblings. Id. Hence, Mother concludes that the trial court abused its discretion in granting the petition to involuntarily terminate her parental rights to R.N.J. and G.J.
¶ 14 As few facts exist to support Mother's position, she attempts to bolster her speculation with non-record commentary about an unrelated case before the trial court and her unique perspective of DHS's practices and policies in general. Id. at 9. In contrast, the trial supported its decision to involuntarily terminate Mother's parental rights with competent evidence of record. In reaching its decision, the trial court explained,
[T]he trial court determined it was in the best interest of each child to have different goals, i.e. permanent legal custody or adoption. It made its determination after receiving extensive testimony regarding each child's unique emotional needs, including the stability in the foster parent's home and the bond-if any-between each child and [Mother].... In terminating [M]other's parental rights, the trial court determined that there was no parental bond between [M]other and her children R.[N.]J. and G.J. As a result, R.[N.]J. and G.J. would not suffer any emotional harm in not visiting with [M]other because they do not see her as their mother; rather, the parental bond exists only with their caregiver. The fact that two siblings have court-ordered visitation with [M]other does not create a parental bond between [M]other and R.[N.]J. or G.J. nor does it create any friction, resentment or [feelings of] abandonment between or among all four siblings.
Trial Court's Supplemental Opinion, 6/30/09, at 1-2. The children's advocate agreed that the trial court's determination served the children's best interest. See Child Advocate's brief at 13-17.
¶ 15 Neither Mother, DHS, nor the children's advocate cited case law with the precise fact pattern underlying this case, and our independent research did not reveal reported cases with similar facts. Unlike the particular circumstances at issue in the case at bar, the agency in the reported cases we uncovered either previously had separated siblings with divergent permanency goals or it envisioned separating the siblings following the goal change. See In re S.B., 833 A.2d 1116 (Pa.Super.2003) (following adjudications of dependency, son remained in parents' household under agency supervision and daughter was placed in foster care with permanency goal of adoption); In re L.J., 456 Pa.Super. 685, 691 A.2d 520 (1997) (dependent half-brothers resided in same foster home until mother's death, when one child's goal was changed to long-term placement in foster home and other child's permanency goal changed to adoption outside of foster home). Hence, the case law does not address the specific intra-foster-home concerns Mother raises herein.
*279 ¶ 16 Nevertheless, upon our thorough review of the record, we concur with the trial court's finding that DHS adduced clear and convincing evidence that terminating Mother's parental rights to R.N.J. and G.J. would best serve the children's developmental, physical, and emotional needs and welfare. During the evidentiary hearing, R.N.J.'s foster care social worker, Korana Bennett, testified that she supervised M.J.'s and R.N.J.'s placement with their foster parents. N.T., 12/12/07, at 146-47, 159. Ms. Bennett has been R.N.J.'s caseworker for the last two years. Id. at 153. R.N.J. was ten months old when she was placed in her current pre-adoptive foster home. Id. at 151-52. On the date of the hearing, she was approximately three-and-one-half-years old.
¶ 17 Ms. Bennett supervised one-half of R.N.J.'s weekly visitations with Mother, and the caseworker observed that the child had to be directed to interact with Mother and the other children in the room during the visit. Id. at 147-48. Ms. Bennett testified that R.N.J. recognized Mother as her parent; however, Mother did not perform motherly tasks for the child. Id. at 156, 159. Instead, she delegated those tasks to twelve-year-old M.J. Id. at 159. Ms. Bennett never observed a rivalry between M.J. and R.N.J. for Mother's attention. Id. at 161.
¶ 18 Ms. Bennett also testified that the pre-adoptive foster family satisfied R.N.J.'s needs and ensured that R.N.J. received services to address her behavioral issues. Id. at 73, 149. R.N.J. shares a very close bond with foster mother. Id. at 149. Thus, Ms. Bennett concluded that adoption is in her best interest and that R.N.J. would not suffer harm if her bond with Mother was severed. Id. at 149-51, 155. Ms. Bennett explained that unlike M.J., who enjoys a bond with Mother, R.N.J. is bonded strongly with her foster mother, who is addressing the child's needs on a consistent basis. Id. at 150, 151-52.
¶ 19 B.M.J.'s and G.J.'s foster care caseworker, Shayla Jones, also testified at the hearing. She has been B.M.J.'s caseworker since 2005. Id. at 107, 118, 126. Ms. Jones testified that G.J. has been in foster care since birth. Id. at 116, 126. Ms. Jones explained that the foster mother was the only parent that one-and-one-half-year-old G.J. knew. Id. at 116.
¶ 20 Along with Ms. Bennett, Ms. Jones was responsible for supervising the children's visitation with Mother. Id. at 108, 123. Ms. Jones testified that Mother attended the weekly one-hour visitation consistently. Id. However, the children tended to interact among themselves during the visits more than with Mother. Id. at 114, 133. Ms. Jones explained that B.M.J., M.J., and recently G.J., frequently would entertain themselves during the visitation by running in and out of the room. Id. at 123. Ms. Jones characterized the visits as affectionless, stating, "There really is not any type of affection during the visits.... [W]hen ... [they] depart it is kind of like a bye, see you next week scenario." Id. at 114. Before G.J. learned to walk, Mother would hold the baby for less than one-half of the visit before requesting to put her in an infant seat or walker. Id. at 122. The children are not sad when visitation ends. Id. at 135. G.J., still a toddler, is nonverbal. Id. at 123.
¶ 21 Ms. Jones testified that adoption was in G.J.'s best interest. Id. at 116-17, 125. G.J. is closely bonded to her foster parent, who is supportive of the child's needs. Id. at 117, 126. In contrast, G.J. showed little affection for Mother. Id. at 114. Ms. Jones also recalled the foster mother's concern when she discovered G.J. might have lost her ability to hear. Id. at 124. Ms. Jones testified that the foster *280 mother was "very upset [and] was actually crying." Id. at 124. In contrast, when advised of the possible hearing loss, Mother evinced no reaction. Id. at 125.
¶ 22 Ms. Jones also testified that DHS originally believed that adoption also would best serve B.M.J.; however, B.M.J.'s and G.J.'s foster mother approached the agency and expressed concerns about nine-year-old B.M.J.'s possible reaction to being alienated from his siblings, particularly his fourteen-year-old brother, R.J., Jr., who had previously resided with B.M.J. and G.J. at the foster home. Id. at 131-32. Significantly, however, there are no similar concerns about G.J. or R.N.J. feeling alienated.[7]
¶ 23 Mother highlights the foster mother's concern about B.M.J.'s possible negative reaction to adoption due to the close relationship B.M.J. shared with R.J., Jr. Mother suggests that the foster parent's concerns would be amplified in the case at bar because R.N.J. and G.J. both share their respective foster homes with siblings who remained attached to Mother. However, unlike nine-year-old B.M.J., who was bonded strongly with Mother and his older siblings, the competent evidence of record confirms that three-year-old R.N.J. and one-and-one-half-year-old G.J. did not share those bonds. Hence, there is no evidentiary basis to assume that their adoption would foster disappointment, guilt, or resentment.
¶ 24 In light of the foregoing testimony, we conclude that the trial court did not abuse its discretion in ordering divergent permanency goals for the children who are placed within the same foster homes. DHS adduced clear and compelling evidence for the trial court to perform its needs and welfare analysis. The trial court considered each child's situation independently. It found that the children's unique emotional needs and their respective relationships with Mother compelled DHS to tailor individualized permanency goals that best served each child's needs and welfare. As the record supports the trial court's determination, we will not disturb it.
¶ 25 Having concluded that the trial court's findings are supported by clear and convincing evidence, we affirm the orders entered on December 12, 2007, wherein the trial court involuntarily terminated Mother's parental rights to R.N.J. and G.J. pursuant to 23 Pa.C.S. § 2511(a)(1) and (b) and changed M.J.'s and B.M.J.'s permanency goals to permanent legal custody.
¶ 26 Orders affirmed.
NOTES
[1] The trial court also terminated the parental rights of R.N.J.'s and G.J.'s father, who did not appeal.
[2] This appeal does not involve Mother's two oldest minor children, R.J., Jr., born April 23, 1993, and B.J., born August 4, 1994. Their permanency goals were previously determined to be alternative planned permanent living arrangements.
[3] The record is silent as to whether the reference was to benzodiazepine, a class of controlled substances, or benzoylecgonine, the primary metabolite of cocaine.
[4] The Adoption and Safe Families Act of 1997 (ASFA), P.L. 105-89, 1997 HR 867 (November 19, 1997), 42 U.S.C. § 671-675, imposes upon states the requirement to focus on the child's needs for permanency rather than the parent's actions and inactions. The amendments to the Juvenile Act, 42 Pa.C.S. § 6301 et seq., provide that a court shall determine certain matters at the permanency hearing, including whether the child has been placed into foster care for fifteen out of the last twenty-two months. See 42 Pa.C.S. § 6351(f)(9). With regard to permanency planning, the Legislature contemplated that after reasonable efforts have been made to establish the biological relationship, the process of the Agency working with foster care institutions to terminate parental rights should be completed within eighteen months. See In re N.W., 859 A.2d 501, 508 (Pa.Super.2004).
[5] As Mother no longer challenges the trial court's decision to grant DHS's petition for PLC relating to M.J. and B.M.J., we do not address it herein.
[6] Since Mother failed to challenge the trial court's determination that the statutory grounds for termination have been satisfied pursuant to § 2511(a), that issue is not before us. In re Smith, 874 A.2d 131, 137 n. 5 (Pa.Super.2005) (Superior Court may not, with limited exceptions for jurisdictional issues, sua sponte address issues not raised by parties).
[7] In fact, when Mother's counsel asked Ms. Bennett whether she perceived a problem with the children sharing the same foster home and having different permanency goals, Ms. Bennett stated, "I can't say at this time, no." N.T., 12/12/07, at 160.