J-A12015-17

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| IN RE ADOPTION OF K.O.K., A MINOR | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: I.K.S. AND C.G.S. | No. 1451 WDA 2016 |

Appeal from the Order Dated August 17, 2016
In the Court of Common Pleas of Greene County
Orphans' Court at No(s): 14 O.C. of 2016

BEFORE: OLSON, J., SOLANO, J. and, RANSOM, J.

MEMORANDUM BY SOLANO, J.:                    **FILED JULY 14, 2017**

I.K.S. ("Mother") and C.G.S. ("Stepfather") (collectively, "Appellants") appeal from the August 17, 2016 order that denied involuntary termination of parental rights of J.J.K. ("Father") to his minor son, K.O.K. ("Child"). Upon careful review, we affirm.

In its decision, the trial court found:

The [c]ourt finds that [the Child] was born [in] 2011. That the [trial c]ourt believes and finds that there is a factual basis to determine that from the date of the [C]hild's birth until September, 2014, [Father] was clearly involved in his son's life. T[hat] he was fully involved in his son's life. The parties agree that the normal bond between a father and son [was] present. The parties each testified that custody was flexible with parents sharing largely the child rearing relationship and that since birth the [C]hild has resided with [Mother].

That prior to September, 2014, it appears that the communication between the parties was amicable and custody arrangements were flexible without problems between the parents.

That in May of 2014, [M]other began a relationship with [Stepfather] and that [M]other and [Stepfather] were married on September 5, 2015. [M]other lived at various locations and lived at a Mechanic[] Street address located in Mt. Morris, Pennsylvania from at least May, 2014 through August, 2015.

That [Appellants] assert[] that from September, 2014 up to the filing of the Petition [for Involuntary Relinquishment of Parental Rights o]n April[ 6], 2016 that at least a period of 6 months passed in which [F]ather did not have contact with his son. . . . The [trial c]ourt finds that after September, 2014 [F]ather, at various times, made arrangements to see his son. However, it appears that [F]ather did not follow up on those arrangements.

However, the parties indicate because of telephone issues communication between [M]other and [F]ather became difficult and [F]ather indicates that his telephone was highly unreliable and he would not always receive telephone calls. However, [F]ather continuously stated that he made attempts to go to where he thought [M]other was living and knock on the door, which was customary in their relationship before September, 2014. However, no one answered the door and he was not able to make contact. The [trial c]ourt finds [F]ather's testimony to be credible.

That also after September, 2014, although [F]ather did not see his child, both [M]other and [F]ather testified that [F]ather left various gifts at [M]other's house. That would be gifts of BB guns and a maternity blanket that was the blanket of his son at birth. However, [M]other did not give these gifts to the [C]hild. Instead, she took the various gifts that [F]ather left and returned them to [F]ather's porch. Also, other attempts were made to continue to reach out to [M]other to continue to see [C]hild. The [trial c]ourt again finds that [Appellants] ha[ve] not proven by clear and convincing evidence that [F]ather had allowed 6 months or more to pass without attempting to make contact with his son.

The Guardian Ad Litem for the child states that [F]ather's home is suitable and notes to the record that the Guardian visited both [M]other and [S]tepfather and had the benefit of observing the [C]hild interact with both [M]other and [Stepfather] and had the ability to observe their home and its environment. The Guardian

Ad Litem also viewed the home and the environment of [F]ather's residence. The Guardian Ad Litem indicated that [F]ather's home was safe, suitable and an appropriate environment for a child. . . .

The [trial c]ourt also finds that [M]other of the [C]hild moved from the Mechanic[] Street address in Mt. Morris to a different address located . . . [in] Mt. Morris Pennsylvania and that this move occurred in August, 2015. The [trial c]ourt is convinced that [F]ather did not know of the address of his child from August, 2015 to the present. That it was only at the time of the service of the petition that he realized the new address of [Mother] or the fact that she had remarried. This address was significant because this had been the address of his former marital home. [M]other indicated that she did not advise [F]ather of her new address and simply speculates that [F]ather should have known, as Mt. Morris is a "small town".

That [F]ather called legal aid in hopes to gain some form of assistance with being able to see his child. However, legal aid was unable to help in this regard and [F]ather then took no further action. That [F]ather indicated that he did not contact the [C]hild's grandparents because they strongly dislike him as being the individual that caused [M]other and ex-husband['] divorce.[1]

That during the time frame in question [F]ather had lost his dad in a tragic car accident and clearly was distraught. The [trial c]ourt also believes that although he did not seek professional treatment [F]ather was suffering from depression during this time. That [F]ather is employed, has a valid driver's license, does not have a criminal or mental health record, and has no drug or alcohol abuse background. It should be noted that there is no involvement of children and youth services, no allegations of physical, sexual, or mental abuse. The [trial c]ourt determines that neither parent has been diagnosed with mental health issues, substance abuse issues, criminal background, that

---

[1] As Mother was married to and living with her now ex-husband at the time of the Child's birth, he was the presumptive father of the Child, but he voluntarily relinquished his parental rights to the Child. N.T. at 35; Trial Ct. Op. at 9-10.

there has been no involvement with children and youth services and that both [M]other[']s and Father[']s home are equally appropriate as asserted by the guardian ad litem.

Trial Ct. Op. at 1-6.

The trial court held a hearing on July 22, 2016, and in light of the arguments made by Appellants, we summarize some of the hearing testimony here. At that hearing, Mother agreed that, prior to September 2014, her interactions with Father were "all very civil and caring" and that "there were no bad feelings" between her and Father. N.T. at 14. However, she said she could give no explanation for why Father just "dropped out of the picture then." *Id.* Mother testified that the last time Father saw the Child was September 27, 2014. *Id.* at 10-11. Mother added that Father "had stopped by the house" two subsequent times in 2014 "and asked if he could visit" the Child, but, after they "set up a time and date," Father did not "show up." *Id.* at 9. Mother also testified that she and the Child lived at the same address on Mechanic Street until August 2015. *Id.* at 10. She also testified that a BB gun "showed up on [her] door" sometime between September 27 and approximately late November 2014. *Id.* at 14-15. Mother returned the BB gun to Father by leaving it on the porch "where [she] suspected him to be staying at." *Id.* at 15. According to Mother, she and Stepfather began dating in May 2014 and were married on September 5, 2015; she described the relationship between the Child and Stepfather as "[w]onderful." *Id.* at 16.

Father testified that he had been employed "recently" and was beginning a new job on August 1, 2016. N.T. at 33. He averred that he has no criminal record and no mental health problems. *Id.* at 33-34, 41, 48. Father did not know the last date that he saw the Child and could not confirm that it was September 27, 2014. Father continued that the last time he was "supposed to see" the Child, he "was supposed to pick [the Child] up on Saturday, and [he] actually showed up on Friday because [he] wasn't paying attention, knocking on the door, no answer, went back home, realized it was Friday. So [he] was like oh, I'm not supposed to get him today." *Id.* at 43. When Father returned to Mother's home on Saturday, again, nobody answered. *Id.*[2] Father testified that he returned to Mother's house more than once a week for a month after that; he also asserted that he tried calling Mother "a time or two" but "thought . . . maybe the phone was an issue" and out-of-service. *Id.* at 44. Father stated that he had a driver's license, a vehicle, and no history of drug abuse. *Id.* at 48-49. Father confirmed that he "had a good relationship" with Appellants prior to September 2014. *Id.* at 57. Father maintained that he "[did]n't want to separate [the Child] from [Stepfather], he just want[ed] back in [the Child's] life." *Id.* at 65.

---

[2] Father never clarified the date of the Friday and Saturday he discussed.

On August 17, 2016, the trial court entered an opinion and order denying Appellants' petition for involuntary relinquishment of Father's parental rights to the Child. On September 16, 2016, Appellants filed a timely notice of appeal. Appellants' brief raises the following issues for our review:

> I. Are the trial court's findings purporting to support the denial of the petition to terminate parental rights of the natural father supported by competent evidence of record?
>
> II. Are the trial court's findings that [F]ather had not allowed six months or more to pass without attempting to make contact with his son supported by the record and is attempting to make contact the proper legal standard in this case?
>
> III. Did the trial court apply the proper legal standard for the termination of parental rights?
>
> IV. Is the trial court's denial of the petition to terminate parental rights against the weight of the evidence?
>
> V. Is the trial court's finding that a bond exists between the natural father and the Child supported by the record and did the trial court apply the proper legal standard to determine the needs and welfare of the Child in this regard?
>
> VI. Did the trial court abuse its discretion in relying on hearsay statements and incompetent evidence and innuendo in making its findings of fact?

Appellants' Brief at 2-3.

We consider Appellants' issues in light of our well-settled standard of review:

> The standard of review in termination of parental rights cases requires appellate courts to accept the findings of fact and credibility determinations of the trial court if they are supported by the record. If the factual findings are supported, appellate

courts review to determine if the trial court made an error of law or abused its discretion. A decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. The trial court's decision, however, should not be reversed merely because the record would support a different result. We have previously emphasized our deference to trial courts that often have first-hand observations of the parties spanning multiple hearings.

*In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013) (citations, brackets, and quotation marks omitted).

As we stated in *In the Interest of S.A.D.*, 555 A.2d 123, 128 (Pa. Super. 1989)

A fundamental purpose of the Juvenile Act is to preserve family unity whenever possible. The Act limits the Commonwealth's course of interference with the family unit to those cases where the parents have not provided a minimum standard of care for the child's physical, intellectual and moral well-being. It is well-settled that the Juvenile Act was not intended to provide a procedure to take the children of the poor and give them to the rich, nor to take children of the illiterate and crude and give them to the educated and cultured, nor to take the children of the weak and sickly and give them to the strong and healthy.

Accordingly, "[a] decision to terminate parental rights [is] never to be made lightly or without a sense of compassion for the parent." *In re Adoption of S.P.*, 47 A.3d 817, 827 (Pa. 2012). Rather, we have pointed out that —

A parent's right to raise his child is one of the most basic rights of western civilization. It is so much a part of our cultural tradition that our courts have enshrined it with constitutional protection despite its absence from the document's text. There is no simple or easy definition of parental duties. Parental duty is best understood in relation to the needs of a child[.]

*In re Matsock*, 611 A.2d 737, 745 (Pa. Super. 1992) (citations and internal

quotation marks omitted). Similarly —

> The custody, care, nurture, and instruction of children resides
> first in the children's natural parents, as a constitutionally
> recognized fundamental right. . . . It is universally agreed that
> the bond of parental affection is unique and irreplaceable. When
> parents act in accordance with the natural bonds of parental
> affection, preservation of the parent-child bond is *prima facie* in
> the best interest of the child, and the state has no justification to
> terminate that bond. On the other hand, a court may properly
> terminate parental bonds which exist *in form* but not *in
> substance* when preservation of the parental bond would consign
> a child to an indefinite, unhappy, and unstable future devoid of
> the irreducible minimum parental care to which that child is
> entitled.

*In re J.W.*, 578 A.2d 952, 957-58 (Pa. Super. 1990) (emphasis in original).

These principles inform our disposition of this case.

Termination of parental rights is governed by Section 2511 of the

Adoption Act, 23 Pa.C.S. §§ 2101–2938, which requires a bifurcated

analysis.

> Initially, the focus is on the conduct of the parent. The party
> seeking termination must prove by clear and convincing
> evidence that the parent's conduct satisfies the statutory
> grounds for termination delineated in Section 2511(a). Only if
> the court determines that the parent's conduct warrants
> termination of his or her parental rights does the court engage in
> the second part of the analysis pursuant to Section 2511(b):
> determination of the needs and welfare of the child under the
> standard of best interests of the child. One major aspect of the
> needs and welfare analysis concerns the nature and status of the
> emotional bond between parent and child, with close attention
> paid to the effect on the child of permanently severing any such
> bond.

*In re L.M.*, 923 A.2d 505, 511 (Pa. Super. 2007) (citations omitted). The burden is on the petitioner seeking termination to prove by clear and convincing evidence that the asserted statutory grounds for seeking the termination of parental rights are met. *In re R.N.J.*, 985 A.2d 273, 276 (Pa. Super. 2009).

> The standard of clear and convincing evidence means testimony that is so clear, direct, weighty, and convincing as to enable the trier of fact to come to a clear conviction, without hesitation, of the truth of the precise facts in issue. If the trial court's findings are supported by competent evidence, we must affirm the court's decision, even if the record could support the opposite result.

*In re D.A.T.*, 91 A.3d 197, 203 (Pa. Super.) (citations and internal quotation marks omitted), *appeal denied*, 95 A.3d 278 (Pa. 2014).

Here, Appellants sought to terminate Father's parental rights pursuant to 23 Pa.C.S. § 2511(a)(1) & (b), which provide:

> **(a) General rule.**—The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds: . . .
>
>> (1) The parent by conduct continuing for a period of at least six months immediately preceding the filing of the petition either has evidenced a settled purpose of relinquishing parental claim to a child or has refused or failed to perform parental duties.
>
> \* \* \*
>
> **(b) Other considerations.**—The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing,

furnishings, income, clothing and medical care if found to be beyond the control of the parent.

Appellant had the burden of proving the requirements of Section 2511(a)(1). *L.M.*, 923 A.2d at 511. Under that provision —

The court should consider the entire background of the case and not simply mechanically apply the six-month statutory provision. The court must examine the individual circumstances of each case and consider all explanations offered by the parent facing termination of his parental rights, to determine if the evidence, in light of the totality of the circumstances, clearly warrants the involuntary termination.

*In re A.S.*, 11 A.3d 473, 482 (Pa. Super. 2010) (citation omitted). In this case, the trial court held that Appellants had "failed to prove that a period of 6 months has passed, pursuant to the statute." Trial Ct. Op. at 6.

Mother testified that the last time Father had performed any parental duties was in 2014, N.T. at 9, but she presented no other evidence corroborating her contention that Father had failed to perform parental duties after that date. Father could not recall when he last performed parental duties, but he testified that he made repeated attempts after September 2014 to see and to interact with the Child. *Id.* at 41, 43-44. The trial court found Father credible but made no credibility determinations as to Mother. Trial Ct. Op. at 3. Since the parties' testimony diverged, the trial court's finding that Appellants did not prove that Father had been absent from the Child's life and had "refused or failed to perform parental

- 10 -

duties" "for a period of at least six months," pursuant to 23 Pa.C.S. § 2511(a)(1), is supported by the record. **T.S.M.**, 71 A.3d at 267.[3]

Appellant's failure to prove the requirements of Section 2511(a) makes it unnecessary to engage in an analysis of the requirements under Section 2511(b). **L.M.**, 923 A.2d at 511. If we were to reach that portion of the Section 2511 inquiry, however, we would agree with the trial court that nothing in Section 2511(b) compels termination here.[4]

_____

[3] Appellants assert that the trial court "applied an incorrect legal standard" of "attempting to make contact" with the Child, but they provide no case law explicating that argument; they simply repeat the language of 23 Pa.C.S. § 2511(a)(1). **See** Appellants' Brief at 29. As the argument portion of Appellants' Brief for this issue, at pp. 29-32, does not cite to pertinent authorities, this issue merits no relief. **In re Estate of Whitley**, 50 A.3d 203, 209 (Pa. Super. 2012) ("The argument portion of an appellate brief must include a pertinent discussion of the particular point raised along with discussion and citation of pertinent authorities[; t]his Court will not consider the merits of an argument which fails to cite relevant case or statutory authority" (internal citations and quotation marks omitted)), **appeal denied**, 69 A.3d 603 (Pa. 2013); **see also Lackner v. Glosser**, 892 A.2d 21, 29-30 (Pa. Super. 2006) (explaining appellant's arguments must adhere to rules of appellate procedure, and arguments which are not appropriately developed are waived on appeal; arguments not appropriately developed include those where party has failed to cite any authority in support of contention); **Estate of Haiko v. McGinley**, 799 A.2d 155, 158-59 (Pa. Super. 2002) (stating rules of appellate procedure make clear appellant must support each question raised by discussion and analysis of pertinent authority; absent reasoned discussion of law in appellate brief, this Court's ability to provide appellate review is hampered, necessitating waiver of issue on appeal).

[4] The trial court stated that, assuming that Appellants had proven "that a period of 6 months had passed," Trial Ct. Op. at 6, the facts still did "NOT justify an involuntary termination of parental rights" pursuant "to the

*(Footnote Continued Next Page)*

- 11 -

In discussing Section 2511(b), we have explained that "[i]ntangibles such as love, comfort, security, and stability are involved in the inquiry into the needs and welfare of the child." *In re C.M.S.*, 884 A.2d 1284, 1287 (Pa. Super. 2005) (citation omitted), *appeal denied*, *C.M.S. v. D.E.H., Jr.*, 897 A.2d 1183 (Pa. 2006). The trial court must "discern the nature and status of the parent-child bond, with utmost attention to the effect on the child of permanently severing that bond." *Id.* (citation omitted).

Instantly, in "determin[ing] the needs and welfare of the [C]hild under the standard of best interest of the [C]hild," *L.M.*, 923 A.2d at 511, the trial court was "not persuaded by clear and convincing evidence that terminating the parental rights is in the best interest of the [C]hild" and found Father's "explanation of his conduct before and after September, 2014, truthful and credible." Trial Ct. Op. at 5, 8. Specifically, the trial court "determine[d] that a bond does exist between [F]ather and [the Child] as evidenced by their continuing and constant relationship from the time of birth [until the Child was about three-and-a-half years old], this in the life of a five year old child." Trial Ct. Op. at 8. The presence of Father in the Child's life until September 2014 is uncontested. N.T. at 10-11, 14, 57. The trial court appeared to find the Child's bonds with "male figures" to be fluid, given "that the [C]hild has encountered various male figures in his household as a result

*(Footnote Continued)* ─────────────────

requirements as laid out in Title 23 § 2511(b)." *Id.* at 7-8 (emphasis in original).

of changing relationships between [M]other" and her ex-husband, Father, and Stepfather. Trial Ct. Op. at 8; *see also id.* at 2, 4, 6 (the Child has already known Mother's ex-husband, Father, and Stepfather as the "father figures" in his short life); N.T. at 16 (Child's relationship with Stepfather), 35 (presence of Mother's ex-husband).

Additionally, the trial court was "not convinced that . . . an ongoing relationship with [Father] is detrimental to the [C]hild." Trial Ct. Op. at 8; *see also id.* at 6 (listing Father's employment, transportation abilities, housing, and lack of criminal, mental health, or children and youth services records or of substance abuse history); N.T. at 33-34, 48-49. The trial court also observed that Father "does not want to separate [the Child] from any family members, including [Stepfather] and clearly wants to be involved in [the Child's] life." Trial Ct. Op. at 9; *see also* N.T. at 65.

We must "accept the findings of fact and credibility determinations of the trial court if they are supported by the record." *T.S.M.*, 71 A.3d at 267. Having reviewed the record, we find that all of these factual findings are supported thereby, and we accept them. *See id.* Accordingly, we hold that the trial court did not abuse its discretion in finding that Appellants, as the petitioners seeking termination, did not "prove by clear and convincing evidence that [the] asserted grounds for seeking the termination of parental rights [were] valid." *R.N.J.*, 985 A.2d at 276.

Appellants' final claim is that "the trial court abuse[d] its discretion in relying on hearsay statements and incompetent evidence and innuendo in making its findings of fact." Appellants' Brief at 40. Appellants point to their unsuccessful objection to Father's testimony that he sought help from a legal aid office but was denied assistance. *See id.* (citing N.T. at 46). They also label the trial court's finding that Father "lost his own father in 2013 and that he was suffering from depression" as "incompetent evidence and innuendo," and complain that the trial court "drew this testimony by leading the witness." *Id.* (citing N.T. at 49). But Appellants cite to no case law or statutory authority to explain how or why any of this contested testimony qualifies as inadmissible hearsay or is in anyway "incompetent." *See id.* Absent such supporting authority, their argument fails to carry any persuasive weight. Moreover, the failure to support an argument with pertinent authority is a violation of our briefing rules which results in waiver of the unsupported issue. *See In re Estate of Whitley*, 50 A.3d 203, 209 (Pa. Super. 2012), *appeal denied*, 69 A.3d 603 (Pa. 2013); *Lackner v. Glosser*, 892 A.2d 21, 29-30 (Pa. Super. 2006); *Estate of Haiko v. McGinley*, 799 A.2d 155, 158-59 (Pa. Super. 2002).

In any event, Father's testimony, N.T. at 46, was offered to explain his course of conduct – *i.e.*, why he did not pursue legal assistance regarding custody of the Child. *See Commonwealth v. Hill*, 549 A.2d 199, 203 (Pa. Super. 1988) (out-of-court statement to explain course of conduct is not

hearsay), ***appeal denied***, 563 A.2d 887 (Pa. 1989); ***Commonwealth v. Carroll***, 513 A.2d 1069, 1071 (Pa. Super. 1986) (while an out-of-court statement offered for its truth is generally inadmissible hearsay, an out-of-court statement offered to explain a course of conduct is not hearsay).

Having discerned no abuse of discretion or error of law, we affirm the trial court's decision. ***T.S.M.***, 71 A.3d at 267.

Order affirmed.


Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 7/14/2017