J-A03020-25

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: T.B., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| APPEAL OF: PHILADELPHIA DEPARTMENT OF HUMAN SERVICES | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 2081 EDA 2024 |

Appeal from the Order Entered July 11, 2024
In the Court of Common Pleas of Philadelphia County Juvenile Division at
No(s):  CP-51-DP-002247-2018

| | | |
|---|---|---|
| IN THE INTEREST OF: T.-G.L.E.B., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| APPEAL OF: PHILADELPHIA DEPARTMENT OF HUMAN SERVICES | : | |
| | : | |
| | : | |
| | : | No. 2082 EDA 2024 |

Appeal from the Order Entered July 11, 2024
In the Court of Common Pleas of Philadelphia County Juvenile Division at
No(s):  CP-51-AP-0000767-2021

BEFORE:  STABILE, J., McLAUGHLIN, J., and LANE, J.

MEMORANDUM BY McLAUGHLIN, J.:                    **FILED APRIL 3, 2025**

The Philadelphia Department of Human Services ("DHS") appeals from the orders denying its petitions to involuntarily terminate the parental rights of A.B. ("Mother") to her minor child, T.B. ("Child") and to change the permanency goal to adoption.[1] The trial court found grounds for termination

---

[1] This Court consolidated these appeals *sua sponte* as they involve related parties and issues. **See** Pa.R.A.P. 513.

under 23 Pa.C.S.A. § 2511(a) but concluded that termination did not serve Child's needs and welfare under 23 Pa.C.S.A. § 2511(b). We affirm.

This Court previously summarized the facts in this case as follows:

> [DHS] first became involved in Child's [born May 2015] life on October 2, 2018, when the agency received a report that Mother inflicted a burning or scalding injury to Child. Shortly thereafter, DHS obtained an order of protective custody and Child was removed from the home. On October 9, 2018, DHS filed a dependency petition asserting that Child lacked proper care or control and was a victim of child abuse. On December 12, 2018, following a hearing, the trial court entered an order finding that Child was a victim of child abuse and that Mother was the perpetrator. On appeal, this Court affirmed the finding of child abuse. On January 10, 2019, Child was adjudicated dependent and placed in foster care with a permanency goal of reunification.

> On July 11, 2019, DHS received a report that Child's half-brother, Z.E., had suffered a lacerated pancreas and fractured ribs while under Mother's care. DHS investigated and concluded that child abuse was indicated as to Mother with respect to Z.E.'s injuries. Consequently, Child's guardian *ad litem* ("GAL") filed a motion seeking a judicial determination that Mother had abused Z.E. pursuant to 42 Pa.C.S. § 6341(c.1). Ultimately, the trial court found, among others, that Z.E. had suffered child abuse at Mother's hands and that aggravated circumstances existed with respect to Child, therefore directing that no further efforts be made to reunify Child with Mother. After Mother appealed, this Court affirmed.

> On December 21, 2021, DHS filed a petition seeking the involuntarily termination of Mother's parental rights pursuant to 23 Pa.C.S.A. § 2511(a)(1), (2), (5), (8), and (b). On that same day, DHS also filed a petition to change Child's permanency goal to adoption.

*Int. of T.B.*, 305 A.3d 988, 2023 WL 5973115, at *1 (Pa.Super. filed Sept. 14, 2023) (unpublished mem.) (citations and quotation marks omitted).

The trial court terminated Mother's parental rights to Child, in December 2022, and changed the permanency goal to adoption. Mother appealed, and this Court vacated the termination decree and the goal change order. ***See id.*** We remanded for further proceedings to determine whether there was a conflict between Child's best and legal interests and to appoint separate counsel for the goal change if the interests were in conflict. Because the original trial judge retired, the new judge was directed to answer three questions on remand:

> (1) whether Child can articulate his preferences; (2) whether those preferences conflict with his best interests; and (3) whether Child's best interests required the appointment of legal interest counsel for purposes of the goal change. Depending on how the trial court answers these three questions, it may decide that new goal change and termination hearings are necessary, or it may conclude that new hearings are unnecessary and enter a new decree and goal change order based on the record.

***Id.*** at *5.

On remand, the trial court found that Child had the capacity to state his own preferences, appointed counsel for Child, and conducted a new termination hearing. ***See*** Trial Court Opinion, filed 9/20/24, at 2. The hearing was held on February 21, 2024, in which the court heard testimony from Cheryl Wellington, the Community Umbrella Agency ("CUA") case manager; Dr. William Russell, Ph.D., the forensic psychologist who evaluated Mother's parental capacity; Julie Campbell, Director of Trauma Services at Children's Crisis Treatment Center ("CCTC"); Veronica Hamilton, Trauma Services

Clinician at CCTC; and Mother. The trial court conducted an *in camera* interview of Child, who was nine years old at the time, with all counsel present.

Of the witnesses who testified at the termination hearing, only Wellington, Mother, and Child testified about the bond between Mother and Child. The trial court accurately summarized the relevant testimony as follows:

> Wellington . . . testified she had been the case manager since April 2022 and had reviewed the entire case file. (N.T., 2/21/24, pp. 20-21). In regard to § 2511(b) and the best interests of [Child], when asked about the relationship between [Child] and his Mother, Ms. Wellington testified [Child] loves his Mother and there is a connection between them. (N.T., 2/21/24, p. 49). Ms. Wellington went on to testify, she could not say for certain there is a healthy bond between them. [*Id.*] Ms. Wellington stated this is because Mother is difficult to read with the way she expresses her love and affection for [Child]. (N.T., 2/21/24, p. 50). According to Ms. Wellington, sometimes it seemed like Mother would do things with [Child] just to pacify him or because she knew she had to do it. [*Id.*] Ms. Wellington testified that Mother never reached out to her between visits to ask about [Child] [*Id.*] [Child] would look to Mother for love but Ms. Wellington testified she was not sure if he would get it from her. [*Id.*] Ms. Wellington testified Mother was not the primary person [Child] would go to for protection and support[. *Id.*]
>
> Based on this previously mentioned testimony and the fact Mother has not addressed the issues that brought this case into DHS care, Ms. Wellington testified she did not believe [Child] would suffer irreparable harm if Mother's parental rights were terminated. (N.T., 2/21/24, pp. 51-52). Ms. Wellington stated because of [Child's] behavioral issues dealing with [Child] can be a lot. She explained you have to be strong and consistent with [Child] so you can develop an understanding of him. According to Ms. Wellington, Mother has not shown an ability to do this. (N.T., 2/21/24, pp. 57-58). Ms. Wellington further testified she believed it was in [Child's] best interest to be freed for adoption. (N.T., 2/21/24, p. 61). Ms. Wellington did testify [Child] has expressed to her that he wants visits with his Mother and wants to be with her. (N.T., 2/21/24, p. 91).

Mother testified at the February 21, 2024, hearing in regard to her bond with [Child]. Mother testified about [Child's] behavioral issues and how she always wanted to know what was going on with him and how she could help. (N.T., 2/21/24, p. 183). Mother further testified that before her parental rights were initially terminated by the [c]ourt . . ., she was involved with [Child's] behavioral health services and she would work with [Child] on his behavior issues with controlling his emotions by talking to him, holding his hand and telling him to calm down and breathe. (N.T., 2/21/24, p. 177-178). This would get [Child] to calm down after 15-20 minutes. (N.T., 2/21/24, p. 79). Mother's last visitation with [Child] was on December 7, 2022, when her visitation was suspended by the [c]ourt.

The TPR attorney, Lue Frierson, Esq., stated at the February 21, 2024, hearing that when she spoke with [Child], he expressed to her his love for his Mother. According to Ms. Frierson, while [Child] did not seem to grasp the concept[] of adoption, he was able to articulate his preferences to her. (N.T., 2/21/24, pp. 214-215). [Child] told Ms. Frierson he wants to visit with his Mother and he wants to live with her if he could. [*Id.*] Ms. Frierson stated that based on [Child's] wishes she would argue that Mother's parental rights should not be terminated. (N.T., 2/21/24, pp. 216).

On May 2, 2024, the [c]ourt asked that [Child] be brought to [c]ourt to testify about his preferences. The [GAL] for [Child] objected. As an alternative, the [c]ourt asked if it could rely on TPR counsel's assertions of [Child's] preferences in rendering its decision. Parties in the matter also objected to this request. After submission of Letter Briefs to address these issues, the [c]ourt allowed G.A.L. to call [Child] as a witness.

On July 11, 2024, [Child] testified[2] he wants to go back with his Mother and live with her forever. (N.T.[Sealed Child Interview], 7/11/24, pp. 21-22) [(unpaginated)]. [Child] testified he likes being with his Mother and seeing his family which includes his siblings. (N.T., 7/11/24, p. 22) [(unpaginated)]. [Child] testified he feels safe when he is with his Mother. (N.T., 7/11/24, p. 24) [(unpaginated)]. [Child] further testified he loves his

_____

[2] Child answered some of the court's and counsel's questions by writing on an mini Etch-a-Sketch. **See** N.T. Sealed Child Interview, 7/11/24, at 18 (unpaginated).

Mother and wants to visit with his Mother and would like to live with her. [***Id.***] [Child] asked the [c]ourt if he could go back and live with his Mother. When the [c]ourt asked [Child] how that would make him feel if he could go back and live with his Mother, [Child] indicated it would make him happy. (N.T., 7/11/24, pp. 30-31) [(unpaginated)]. When asked how it would make him feel if he could not go back to live with his Mother, [Child] indicated it would make him sad. (N.T., 7/11/24, p. 31) [(unpaginated)]. The [c]ourt also asked [Child] how it would make him feel if the visits with Mother started happening again and [Child] indicated it would make him happy. (N.T., 7/11/24, pp. 32-33) [(unpaginated)]. Lastly, [Child] testified he was currently staying with [his current foster parent] but he does not want to stay there and would like to go to his Mother's house. (N.T., 7/11/24, p. 33) [(unpaginated)].

Trial Ct. Op. at 5-8.

At the conclusion of the hearing, the trial court found that DHS had met its burden by clear and convincing evidence to terminate Mother's parental rights pursuant to 23 Pa.C.S.A. § 2511(a), but did not meet its burden as to 23 Pa.C.S.A. § 2511(b). N.T., 7/11/24, at 30, 36. The court thus denied DHS's petitions to involuntarily terminate Mother's parental rights and change the goal to adoption. This appeal followed.

DHS raises the following questions:

1. Whether the lower court erred and abused its discretion by denying DHS's petition for involuntary termination of Mother's parental rights under 23 Pa.C.S. § 2511(b), as termination clearly and convincingly meets the developmental, physical and emotional needs and welfare of Child?

2. Whether the lower court erred and abused its discretion when it failed to consider the evidence of the negative effects of Mother's continuing contact with Child and therefore failed to adequately consider the emotional needs of Child?

DHS's Br. at 4.

We address DHS's two issues together as they are related. DHS argues that the trial court erred in concluding that the requirements of Section 2511(b) were not satisfied because it "impermissibly focused on the Child's wish to be reunified and ignored evidence of the negative effects of the Child's relationship and contact with Mother." *Id.* at 24. DHS asserts that the "court's reliance on Child's stated desire to be reunified with Mother was manifestly unreasonable" as "it ignored the damage caused by the unhealthy attachment with Mother and failed to recognize that even badly abused and neglected children will retain some positive emotion towards the abusive or neglectful parent." *Id.* at 20 (internal quotation marks omitted).

DHS contends that in making its finding that there was a positive parental bond between Mother and Child, the court ignored or did not consider specific evidence, including the following: Wellington's testimony that Child would get angry during visits with Mother and had to be restrained from hurting himself or others; Dr. Russell's testimony that Mother was not able to provide Child with structure and consistency, displaced blame for Child's abuse on her paramour, and did not acknowledge or accept responsibility for Child's injuries; Hamilton's testimony that she did not believe that Mother was at a place to learn about the impact of trauma on Child, and Child's aggression and suicidal and homicidal ideations reportedly increased following visits with Mother; and Child's testimony that he did not tell Mother about the abuse by

Mother's paramour when it occurred because he did not think that she would believe him. *Id.* at 27-29.

The GAL likewise argues that because Mother has "demonstrated an ongoing inability to provide a safe physical, emotional and psychological environment for the Child, the trial court abused its discretion in denying DHS'[s] petition to terminate her parental rights" under Section 2511(b). GAL's Br. at 26. The GAL maintains that Mother failed to engage in Child's behavioral health needs or address her responsibility for Child's situation, and failed to engage in trauma therapy that could explain Child's trauma. *Id*. The GAL emphasizes that Mother never progressed to unsupervised visits in the time Child has been in care. **Id.** at 27.

The GAL additionally points out that although Wellington testified that Child has a bond with Mother, it is not a parent-child bond. *Id.* at 32. The GAL also argues that Wellington stated that Child did not look to Mother for love or support, and only asked about his siblings, and not about Mother. *Id.* at 33.

The GAL further argues that Dr. Russell "found that Mother has no insight into what role she had in [Child's] case, not just not taking responsibility for what happened, but not understanding as to why [Child] and her other children went into care." *Id.* at 30. The GAL asserts that Dr. Russell "did not believe [Mother] could provide a safe environment for [Child], as his significant emotional needs and behaviors were beyond her ability to handle,

and her own instability and lack of insight made it likely that [Child] would not progress in her care." ***Id.***

The GAL also argues that Child's own testimony demonstrated Mother's failure to meet his emotional needs because Child testified that when he told Mother that his Mother's paramour was abusing him while Mother was at work, Mother did not believe him. ***Id.*** at 31. Thus, the GAL contends that "[w]hile [Child] said he wanted to live with Mother, [Child] showed that he did not feel Mother could provide a safe physical, emotional and psychological environment for him." ***Id.***

"[A]ppellate review of an order granting or denying a petition to terminate involuntarily a person's parental rights is limited." ***Int. of S.K.L.R.***, 256 A.3d 1108, 1127 (Pa. 2021). When we review a trial court's decision to grant or deny a petition to involuntarily terminate parental rights, we must accept the findings of fact and credibility determinations of the trial court if the record supports them. ***In re T.S.M.***, 71 A.3d 251, 267 (Pa. 2013). "If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion." ***Id.*** (citation omitted). "[A] decision may be reversed for an abuse of discretion only upon a determination of manifest unreasonableness, partiality, prejudice, bias, or ill-will." ***Id.*** (citation omitted) "Absent an abuse of discretion, an error of law, or insufficient evidentiary support for the trial court's decision, the decree must stand." ***In re R.N.J.***, 985 A.2d 273, 276 (Pa.Super. 2009) (citation omitted). We may not reverse merely because the record could support a different

result. *In re T.S.M.*, 71 A.3d at 267. Appellate courts are not permitted to make "close calls based on fact-specific determinations." *Int. of S.K.L.R.*, 256 A.3d at 1123 (citation omitted). Rather, we give great deference to the trial courts "that often have first-hand observations of the parties spanning multiple hearings." *Id.* at 1127 (citation omitted).

"The trial court is free to believe all, part, or none of the evidence presented, and is likewise free to make all credibility determinations and resolve conflicts in the evidence." *In re M.G.*, 855 A.2d 68, 73-74 (Pa.Super. 2004) (citation omitted). "Appellate courts reviewing . . . fact-bound claims arising in termination matters should defer to the trial judges who see and hear the parties and can determine the credibility to be placed on each witness and, premised thereon, gauge the likelihood of the success of the current permanency plan[.]" *Interest of K.T.*, 296 A.3d 1085, 1117 (Pa. 2023) (citation and internal quotation marks omitted). Even if an appellate court would have come to a different conclusion based on the record, "we are not in a position to reweigh the evidence and the credibility determinations of the trial court." *Id.* (citation omitted).

Termination of parental rights is controlled by Section 2511 of the Adoption Act. *In re L.M.*, 923 A.2d 505, 511 (Pa.Super. 2007). Under this provision, the trial court must engage in a bifurcated analysis prior to terminating parental rights:

> Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory

grounds for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

*Id.* (citations omitted).

Here, the court found that statutory grounds for termination existed under Section 2511(a). This finding is not contested. We therefore review whether the second prong of the analysis was met, which is the subject of this appeal. Section 2511(b) states, in relevant part:

**(b) Other considerations.--**The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent.

23 Pa.C.S.A. § 2511(b).

"[S]ection 2511(b) focuses on whether termination of parental rights would best serve the developmental, physical, and emotional needs and welfare of the child." *In re Adoption of J.M.*, 991 A.2d 321, 324 (Pa.Super. 2010). Under a Section 2511(b) analysis, the court must "discern the nature and status of the parent-child bond, with utmost attention to the effect on the child of permanently severing that bond." *Id.*

Additionally, our Supreme Court has explained that "analysis of the parental bond is but one part of the overall [Section 2511(b)] analysis, which includes a determination of whether the bond is necessary and beneficial to the child, *i.e.*, whether maintaining the bond serves the child's developmental, physical, and emotional needs and welfare." **Interest of K.T.**, 296 A.3d at 1113. The Section 2511(b) inquiry additionally must include consideration of other factors such as: "the child's need for permanency and length of time in foster care . . .; whether the child is in a preadoptive home and bonded with foster parents; and whether the foster home meets the child's developmental, physical, and emotional needs, including intangible needs of love, comfort, security, safety, and stability." **Id.** "These factors and others properly guide the court's analysis of the child's welfare and all her developmental, physical, and emotional needs." **Id.** Further, "[t]rial courts have the discretion to place appropriate weight on each factor present in the record before making a decision regarding termination that best serves the child's specific needs." **Id.**

In making its determination that termination of Mother's parental rights did not serve Child's needs and welfare under Section 2511(b), the trial court followed the factors set forth in **Interest of K.T.** It explained:

> In regard to the best interests of a child, the first thing to be considered is whether there is a parental bond between the child and parent. The [c]ourt heard from Ms. Wellington who testified that [Child] loves his Mother and there is some type of connection there, but in her opinion, there was no parent-child bond. This was due to Mother not being able to show parental affection to [Child], Mother never reaching out between visits to check on [Child], and [Child] never asking about Mother between visits. Ms.

Wellington also testified she believed there would not be any irreparable harm to [Child] if Mother's rights were terminated. According to Ms. Wellington, Mother has not shown she could be strong and consistent, which is what [Child] needs. This relates back to Mother's lack of meeting her objectives in regard to [Child].

While the [c]ourt found Ms. Wellington's testimony credible, the [c]ourt does not agree with her opinion that there is no parental bond between Mother and [Child]. The [c]ourt heard from [Child] himself who testified that he wanted to go back with his Mother. [Child] also told the [c]ourt he wanted to go back and live with his Mother forever. [Child] told the [c]ourt he likes seeing his Mother and family which includes his siblings and he likes living with them. [Child] indicated to the [c]ourt he feels safe with his Mother, he loves his Mother, he wants to visit his Mother, and wants to live with his Mother. When the [c]ourt questioned [Child] further as to what he would want the [c]ourt to do, [Child] stated he wanted the [c]ourt to allow him to see his Mother and to go live with her. [Child] indicated he would be sad if the [c]ourt did not allow it. The [c]ourt also heard testimony from Mother that there was a bond between herself and [Child]. The [c]ourt found the testimony of [Child] and his Mother in regard to the bond between them to be credible. Based on that testimony, the [c]ourt found there is a parental bond between Mother and [Child] that was necessary and beneficial to [Child].

Trial Ct. Op. at 8-9.

The trial court then examined whether termination would unnecessarily destroy the bond between Mother and Child and cause any irreputable harm to Child. The court concluded that "based on [Child's] testimony and demeanor to the [c]ourt which the [c]ourt found credible and very candid, the [c]ourt found if it terminated Mother's rights it would cause extreme emotional consequences and significant irreparable harm to [Child]." *Id.* at 9.

The court then explained that pursuant to ***Interest of K.T.***, it was required to consider the bond between Child and his foster family. ***Id.*** at 9-10. The court pointed out that there was no testimony about any bond that Child has with his foster family or that he was in a pre-adoptive home. ***Id.*** at 10. The court further noted there was no testimony regarding whether the foster family was meeting Child's "developmental, physical, and emotional needs including the tangible needs of love, comfort, security, safety, and stability." ***Id.*** The court also considered the time Child had been in care and stated that Child needed permanency. ***Id.*** The court concluded there was not clear and convincing evidence that terminating Mother's parental rights was in the best interest of Child pursuant to Section 2511(b) because "[t]here clearly is a necessary and beneficial parental bond between Mother and [Child] and termination of that bond would cause irreparable harm to [Child]" and "would have a detrimental effect on the developmental, physical and emotional needs of [Child]." ***Id.***

Adhering to this Court's abuse-of-discretion standard, we find that the record supports the trial court's decision. The court carefully considered and weighed all the evidence in the record and applied the correct legal standard before denying DHS's petition to terminate Mother's parental rights. The court made specific credibility determinations, which we must defer to, and we cannot reweigh the evidence. ***See Interest of K.T.***, 296 A.3d at 1117; ***see also Int. of S.K.L.R.***, 256 A.3d at 1129 (stating that because trial courts in termination cases "are on the front lines assessing the credibility of witnesses

- 14 -

and weighing competing and often challenging evidence, it is paramount that, in reviewing trial courts' decisions in this arena, appellate courts defer to trial courts' first-hand observations as they relate to factual determinations"). The court met with Child in chambers and observed his demeanor, finding him very candid and credible. During his testimony, Child repeatedly asked about Mother and requested to live with her. *See* N.T. Sealed Child Interview, 7/11/24, at 5, 20, 21-22, 24, 26, 29, 31, 35-36 (unpaginated). Based on the court's observations, the court found that termination of Mother's parental rights would cause extreme emotional consequences and significant irreparable harm to Child.

Further, the court acknowledged that the presence of a parent-child bond alone is legally insufficient to preclude termination of parental rights. It properly considered other factors pursuant to *Interest of K.T.*, including the facts that Child had been in care for an extended period of time and needed permanency, Child did not want to stay with his current foster family, who was not a pre-adoptive resource, and there was no testimony regarding any bond between Child and the foster family or whether the foster home is meeting Child's emotional and developmental needs. Contrary to DHS's argument that the trial court ignored certain evidence, the record reveals that the court considered all the evidence but chose to rely on other evidence, which is within the trial court's province. This Court cannot reweigh the evidence or substitute its judgment where a trial court makes a close call in a fact-intensive termination proceeding. As such, we conclude the trial court did

not abuse its discretion in denying DHS's termination petition under Section 2511(b). We therefore affirm the court's orders.

Orders affirmed.

Judgment Entered.

*Benjamin D. Kohler*

Benjamin D. Kohler, Esq.
Prothonotary

Date: 4/3/2025