J-A21021-21

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: A.M.M., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: M.M., FATHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 933 EDA 2021 |

Appeal from the Order Entered May 10, 2021
In the Court of Common Pleas of Philadelphia County Juvenile Division at
No(s): CP-51-AP-0000233-2021

BEFORE:    KUNSELMAN, J., NICHOLS, J., and STEVENS, P.J.E.*

MEMORANDUM BY NICHOLS, J.:                         **FILED FEBRUARY 1, 2022**

M.M. (Father) appeals[1] from the order granting the petition filed by the Philadelphia Department of Human Services (DHS) to involuntarily terminate his rights to his minor child, A.M.M. (Child), born in May of 2019.  After careful review, we affirm.

The trial court accurately summarized the facts of this matter as follows:

[DHS] first became aware of this family on May 19, 2019, when it received a General Protective Services (GPS) report concerning allegations that Mother tested positive for Percocet at Child's birth, for which she did not have a prescription.  The GPS report stated that although [Child] did not test positive for any substances at her birth, she would be assessed for withdrawal and possibly started on a morphine treatment because [Child's] Neonatal Abstinence Syndrome (NAS) score was 10, which was high.  The GPS report alleged that Mother also had two male children that

---

* Former Justice specially assigned to the Superior Court.

[1] Mother filed separate appeals from the order, which are docketed at 1121 EDA 2021 and 1120 EDA 2021 and addressed in a separate memorandum.

were residing with relatives in Bucks County, Pennsylvania.[2]  The GPS report also alleged [that] Mother was diagnosed with anxiety and depression, but was not receiving treatment or prescribed medication.

On May 20, 2019, DHS visited [Child] at Einstein Medical Center (EMC), and hospital staff confirmed that [Child] was suffering from severe withdrawal.  Hospital staff stated that [Child] was receiving morphine maintenance and would need to remain hospitalized for further treatment. . . .

DHS visited Mother and Father at [Child's] paternal grandmother's home on May 20, 2019.  Mother denied having a history of substance abuse issues.  Mother stated that she used one 15 milligram Percocet pill, which she purchased illegally, to treat back pain.  Father denied awareness of Mother's drug use.  Father also stated that he used drugs for 12 years until 2018, when he became sober.[3]

On June 5, 2019, DHS received a supplement to the GPS report alleging that Mother's drug of choice was heroin or Phencyclidine (PCP).  The GPS report alleged that Mother had not been able to maintain sobriety.  The report also stated that the adoptive parent of [Child's] siblings was willing to be a placement resource for [Child].

[After spending several weeks in the NICU, Child was discharged from EMC on June 24, 2019.  That same day, the trial court held a shelter care hearing, at which] the temporary commitment to DHS was ordered to stand.  On that date, [Child] was placed in the care of her siblings' adoptive parent, where she remains.  On July 1, 2019, [Child] was adjudicated dependent and committed to DHS.

A Single Case Plan (SCP) meeting was held on July 10, 2019, at which time the permanency goal was reunification.  The parental

---

[2] Mother's two older children are Child's half-brothers.  Both siblings reside with their adoptive parent and that family's biological children.

[3] At that meeting, Father told DHS that he was in violation of the terms of his probation sentence for a prior criminal matter.  The record reflects that Father was arrested for violating his probation on June 13, 2019, and subsequently incarcerated.

objectives for Father were to comply with court-ordered dual diagnosis treatment; to participate in three random drug screens; to participate in visits; and to complete parenting classes. Father's single case plan objectives remained consistent throughout the life of the case.

On July 29, 2020, Community Umbrella Agency (CUA) changed the permanency goal for [Child] to adoption.

On April 26, 2021, DHS filed petitions to change the goal from reunification to adoption and to involuntarily terminate Father's parental rights.

[On May 10, 2021, the trial court held a hearing on DHS's petitions.] At the hearing, the court heard testimony from [Nathan Kipp, a case manager from] Community Umbrella Agency (CUA), [Robert Buchofer from] Community Behavioral Health (CBH), [and Mother and Father, who testified on their own behalf.] . . . Mr. Kipp testified that he [had been assigned to] this case since its inception at [Child's] birth on May 17, 2019. N.T. Termination Hr'g, 5/10/2021, at 13. Mr. Kipp testified that [Child] came into care because Mother tested positive for Percocet at [the time of Child's] birth. Mr. Kipp testified that although [Child] did not test positive for any substances at birth, she was placed on morphine maintenance to help with withdrawal symptoms. *Id.*

Mr. Kipp further testified that Father's single case plan objectives were as follows: (1) maintain housing and employment, (2) participate in visitation, (3) complete parenting classes through ARC; (4) comply with court-ordered dual diagnosis treatment, and (5) submit random drug screens. *Id.* at 21-25. Mr. Kipp testified that throughout the life of the case, CUA [had] attempted to make outreach with Father via phone calls and text messages at least once per week, but [Mr. Kipp] stated that he had difficulty reaching Father. *Id.* at 24, 27. Mr. Kipp described the process of getting in contact with Father as a "struggle" and stated that, in his opinion, Father was "avoiding" him. *Id.* at 24, 28. Mr. Kipp testified that Father's phone number and residence changed several times, and that Father was incarcerated several times throughout the life of the case. *Id.* at 24.

Mr. Kipp rated Father's compliance with his single case plan objectives as "minimal" and Father's progress towards alleviating the reasons that brought [Child] into care as "none." *Id.* at 31. Father was referred for a forthwith drug screen on October 9, 2019, which he submitted. *Id.* at 23 at 19-25. Additionally, Mr.

Kipp testified that CUA also referred Father to the Clinical Evaluation Unit (CEU) for six random drug screens, for which Father has never appeared. ***Id.***

Mr. Buchhofer, from CBH, testified that Father was admitted to Ambrosia for an inpatient drug and alcohol treatment program on February 11, 2021 and was successfully discharged on March 2, 2021. ***Id.*** at 49, 50. At the time of his discharge from Ambrosia, Mr. Buchhofer testified that Father's diagnosis was "opioid use disorder, severe."

Father did not engage in a mental health program other than Ambrosia. ***Id.*** at 26. As part of his discharge plan from Ambrosia, Father was to attend an Intensive Outpatient Program (IOP) through NET, but neither Mr. Buchhofer nor Mr. Kipp had any documentation that Father attended an IOP. ***Id.*** at 24, 50. Mr. Kipp testified that after Father was released from prison, he completed an inpatient drug and alcohol program at Beacon Point Recovery. ***Id.*** at 24. He provided a certificate of completion dated March 11, 2021. ***Id.*** Mr. Kipp also testified that Father reported that he overdosed on fentanyl in April [of] 2020, which paternal grandmother confirmed. ***Id.*** at 25, 26.

Mr. Kipp testified that Father was referred to BHS for a mental health evaluation. ***Id.*** at 27. CUA has no documentation indicating that Father ever obtained an evaluation. ***Id.*** Mr. Kipp further testified that Father did not engage in parenting or any other services through ARC, nor did Father provide CUA with certificates from previous parenting classes Father claimed to attend. ***Id.*** at 27. Similarly, Mr. Kipp testified that Father's current housing and employment status is unknown due to Father's sporadic contact with Mr. Kipp. ***Id.*** at 27.

Mr. Kipp testified that Father's visits with [Child] were to be supervised weekly at the agency for one hour. ***Id.*** at 28. Father's visits remained supervised throughout the life of the case. ***Id.*** at 28, 29. Mr. Kipp testified that Father attended approximately one quarter of his agency visits and rarely attended virtual visits with [Child]. ***Id.*** at 29. With regard to Father's ability to comfort [Child], Mr. Kipp stated, "I've seen a time when she was in distress and he tried to comfort her, but she just didn't really recognize him as a source of comfort." ***Id.*** at 29, 30. Regarding Father's relationship with [Child], Mr. Kipp testified that there was no bond between [Child] and Father and that [Child] never asked to see Father. ***Id.*** at 30. Contrarily, [Child] is bonded with her kinship

parents and everyone in the kinship family. *Id.* at 33. [Child] looks to her kinship parents for her basic needs as well as love, support, care, and comfort. *Id.* Mr. Kipp testified that the kinship parents' home is a pre-adoptive home for [Child]. *Id.* Ms. Kipp advised the court that [Child] has lived with her kinship parents her entire life except when she was in the hospital. *Id.* at 32. He stated that she was doing very well in the home, and that it was in [Child's] best interest to change her goal to adoption. *Id.* at 30, 33. Mr. Kipp stated that if the Court were to involuntarily terminate Father's rights, there would be no irreparable harm to [Child]. *Id.* at 30.

Trial Ct. Op., 10/20/21, at 1-6.

On May 10, 2021, the trial court issued an opinion and order granting DHS's petition to terminate Father's parental rights under Section 2511(a)(1), (2), (5), (8), and (b). Father filed a timely notice of appeal and complied with Pa.R.A.P. 1925(a)(2)(i) and (b).[4]

On appeal, Father presents the following issues for our review:

1. Whether the trial court erred and/or abused its discretion by terminating the parental rights of Father pursuant to 23 Pa.C.S. [§] 2511(a)(1) where Father presented evidence that he tried to perform his parental duties.

2. Whether the trial court erred and/or abused its discretion by terminating the parental rights of Father pursuant to 23 Pa.C.S. [§] 2511(a)(2) where Father presented evidence that he has remedied his situation by maintaining housing, taking parenting classes and intensive drug treatment counselling and has the present capacity to care for [Child].

3. Whether the trial court erred and/or abused its discretion by terminating the parental rights of Father pursuant to 23 Pa.C.S.

_____

[4] On September 27, 2021, this Court issued an order remanding this matter to the trial court for a Rule 1925(a) opinion. The trial court timely complied and issued a Rule 1925(a) opinion stating the reasons for the termination and goal change orders and addressing the issues raised in Father's Rule 1925(b) statement.

[§] 2511(a)(5) where evidence was provided to establish that the children were removed from the care of the Mother and Father is now capable of caring for [Child].

4. Whether the trial court erred and/or abused its discretion by terminating the parental rights of Father pursuant to 23 Pa.C.S. [§] 2511(a)(8) where evidence was presented to show that Father is now capable of caring for [Child] after he completed parenting classes, maintained housing at his mother's home and completed his inpatient drug treatment program.

5. Whether the trial court erred and/or abused its discretion by terminating the parental rights of Father pursuant to 23 Pa.C.S. [§] 2511(b) where evidence was presented that established the child had a close bond with her Father.

Father's Brief at 7 (some formatting altered).

In reviewing an appeal from an order terminating parental rights, we apply the following standard of review:

[A]ppellate courts must apply an abuse of discretion standard when considering a trial court's determination of a petition for termination of parental rights. As in dependency cases, our standard of review requires an appellate court to accept the findings of fact and credibility determinations of the trial court if they are supported by the record. [*In re R.J.T.*, 9 A.3d 1179, 1190 (Pa. 2010)]. If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. As has been often stated, an abuse of discretion does not result merely because the reviewing court might have reached a different conclusion. Instead, a decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will.

As we discussed in *R.J.T.*, there are clear reasons for applying an abuse of discretion standard of review in these cases. We observed that, unlike trial courts, appellate courts are not equipped to make the fact-specific determinations on a cold record, where the trial judges are observing the parties during the relevant hearing and often presiding over numerous other hearings regarding the child and parents. Therefore, even where the facts could support an opposite result, as is often the case in

- 6 -

dependency and termination cases, an appellate court must resist the urge to second guess the trial court and impose its own credibility determinations and judgment; instead we must defer to the trial judges so long as the factual findings are supported by the record and the court's legal conclusions are not the result of an error of law or an abuse of discretion.

*In re Adoption of S.P.*, 47 A.3d 817, 826-27 (Pa. 2012) (some citations omitted).

The burden is on the petitioner "to prove by clear and convincing evidence that [the] asserted grounds for seeking the termination of parental rights are valid." *In re R.N.J.*, 985 A.2d 273, 276 (Pa. Super. 2009). We have explained that "[t]he standard of clear and convincing evidence is defined as testimony that is so 'clear, direct, weighty and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue.'" *Id.* (citation omitted).

Our case law has made clear that under Section 2511, the court must engage in a bifurcated process prior to terminating parental rights. Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b) . . . .

*In re L.M.*, 923 A.2d 505, 511 (Pa. Super. 2007) (citations omitted).

Further, we "may affirm the trial court's decision regarding the termination of parental rights with regard to any one subsection of section 2511(a)." *In re M.T.*, 101 A.3d 1163, 1179 (Pa. Super. 2014) (*en banc*) (citation omitted).

## Section 2511(a)(2)

We first address Father's challenge to the evidence supporting termination under Section 2511(a)(2).  Father's Brief at 17.  Father argues that he "substantially completed his [SCP] goals of parenting classes, drug and mental health treatment, and employment."  **_Id._**  Further, Father contends that he "continues to attend his drug and mental health treatment program."  **_Id._**  Finally, Father asserts that he "resides with his mother and can now provide a safe home for himself and his child."  **_Id._**  Therefore, Father concludes that "grounds to terminate his rights under [Section] 2511(a)(2) do not exist."  **_Id._**

Section 2511(a)(2) provides as follows:

**§ 2511. Grounds for involuntary termination**

**(a) General rule.**—The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

\* \* \*

(2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

23 Pa.C.S. § 2511(a)(2).

To satisfy the requirements of [Section] 2511(a)(2), the moving party must prove (1) repeated and continued incapacity, abuse, neglect or refusal; (2) that such incapacity, abuse, neglect or refusal caused the child to be without essential parental care, control or subsistence; and (3) that the causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied.  The

grounds for termination are not limited to affirmative misconduct, but concern parental incapacity that cannot be remedied.

*In re C.M.K.*, 203 A.3d 258, 262 (Pa. Super. 2019) (citations and quotation marks omitted).

Further, this Court has explained:

The grounds for termination of parental rights under Section 2511(a)(2), due to parental incapacity that cannot be remedied, are "not limited to affirmative misconduct." *In re A.L.D.*, 797 A.2d 326, 337 (Pa. Super. 2002).

> Unlike subsection (a)(1), subsection (a)(2) does not emphasize a parent's refusal or failure to perform parental duties, but instead emphasizes the child's present and future need for essential parental care, control or subsistence necessary for his physical or mental well-being. Therefore, the language in subsection (a)(2) should not be read to compel courts to ignore a child's need for a stable home and strong, continuous parental ties, which the policy of restraint in state intervention is intended to protect. This is particularly so where disruption of the family has already occurred and there is no reasonable prospect for reuniting it.

> *In re E.A.P.*, 944 A.2d 79, 82 (Pa. Super. 2008) (internal citations and quotation marks omitted).

Thus, while "sincere efforts to perform parental duties," can preserve parental rights under subsection (a)(1), those same efforts may be insufficient to remedy parental incapacity under subsection (a)(2). "Parents are required to make diligent efforts toward the reasonably prompt assumption of full parental responsibilities." [*A.L.D.*, 797 A.2d at 340]. A "parent's vow to cooperate, after a long period of uncooperativeness regarding the necessity or availability of services, may properly be rejected as untimely or disingenuous." *Id.*

*In re Z.P.*, 994 A.2d 1108, 1117-18 (Pa. Super. 2010) (some citations omitted and formatting altered).

Here, the trial court addressed Section 2511(a)(2) as follows:

Father's incapacity under [Section] 2511(a)(2) existed given that Father failed to demonstrate a concrete desire or ability to remedy the conditions that led to [Child's] placement.  Father has a history of many years of drug use and Mr. Buchhofer testified that at the time of Father's discharge from Ambrosia's drug and alcohol program on March 1, 2021, his diagnosis was severe opioid use disorder.  While Father completed an inpatient drug and alcohol program, he failed to provide documentation that he attended an [Intensive Outpatient Program (IOP)], as required under his discharge plan.  Father has never progressed beyond one-hour supervised visits per week with [Child], has not engaged in ARC services, and did not engage in a mental health program.  Additionally, due to Father's sporadic contact with Mr. Kipp, his current housing and employment status is unknown.  This [c]ourt found that Father's failure to fully or substantially comply with his single case plan objectives throughout the duration of the case left [Child] without essential parental care, control, and subsistence necessary for her physical or mental well-being, and the causes of the incapacity will not be remedied by Father.  For these reasons, the [c]ourt found that clear and convincing evidence existed to justify the involuntary termination of Father's parental rights pursuant to [Section] 2511(a)(2).

Trial Ct. Op. at 12.

Following our review, we find no abuse of discretion or error of law in the trial court's conclusion that DHS presented clear and convincing evidence to support termination of Father's parental rights under Section 2511(a)(2). *See S.P.*, 47 A.3d at 826-27; *see also R.N.J.*, 985 A.2d at 276.

The record reflects that after Child was placed in kinship care in June of 2019, Father's SCP objectives were as follows: (1) maintain housing and employment, (2) participate in visitation, (3) complete parenting classes through ARC, (4) comply with court-ordered dual diagnosis treatment, and (5)

submit random drug screens. *See* N.T. Termination Hr'g at 21-25. The trial court credited Mr. Kipp's testimony that Father minimally complied with his permanency objectives and made no progress in achieving them. *See id.* at 31.

Specifically, with respect to housing, although Father claimed to be living with paternal grandmother, Mr. Kipp testified that he was unaware of any information concerning Father's housing as of the date of the termination hearing. *Id.* at 27. Notably, Mr. Kipp testified that communicating with Father was "a struggle," in part because Father's phone number and residence "changed several times." *Id.* at 24. Mr. Kipp also stated that at the time of the hearing, he had not spoken to Father in several months. *Id.* at 27.

Regarding visitation, Mr. Kipp testified that Father had weekly, supervised visits for one hour. *Id.* at 28-29. However, Father only attended "about a quarter" of the visits that were available to him. *Id.* at 29.

Additionally, Mr. Kipp testified that Father did not complete any parenting classes at ARC. *Id.* at 27. Although Father claimed that he completed a parenting course while he was incarcerated, he did not submit any proof of such completion as required by DHS. *Id.* at 70-71.

Finally, with respect to Father's dual diagnosis treatment and drug screens, Mr. Kipp testified that Father failed to attend any of the six random drug screens that were requested. *Id.* at 23. Father self-reported that he overdosed on fentanyl in April of 2020. *Id.* at 24-25. Father was subsequently re-incarcerated and upon his release on March 11, 2021, he

completed an inpatient drug and alcohol program at Beacon Point Recovery. However, Mr. Kipp testified that Father never engaged in a mental health program. *Id.* at 26. Further, Father was referred to Behavioral Health Services for evaluations, but he did not attend any evaluations. *Id.* at 27.

Under these circumstances, the record supports the trial court's conclusion that Father's continued incapacity has caused Child to be without essential parental care and that the causes of that incapacity cannot or will not be remedied. *See C.M.K.*, 203 A.3d at 262; *Z.P.*, 994 A.2d at 1117-18. Therefore, we discern no abuse of discretion by the court in determining that Father's conduct warrants termination under Section 2511(a)(2). *See S.P.*, 47 A.3d at 826-27; *see also R.N.J.*, 985 A.2d at 276. Accordingly, Father is not entitled to relief. *See M.T.*, 101 A.3d at 1179 (stating that we may affirm a termination order based on any subsection of Section 2511(a)).

### Section 2511(b)

Father also challenges the trial court's conclusions regarding Child's best interests under Section 2511(b). Father merely argues that he has a bond with Child and that he "should have been provided with visits while he was incarcerated." Father's Brief at 19.

Section 2511(b) states:

**(b) Other considerations.—**The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings,

- 12 -

income, clothing and medical care if found to be beyond the control of the parent. . . .

23 Pa.C.S. § 2511(b).

This Court has stated that the focus in terminating parental rights under Section 2511(a) is on the parent, but the focus of Section 2511(b) is on the child. **See In re C.L.G.**, 956 A.2d 999, 1008 (Pa. Super. 2008) (*en banc*). In reviewing the evidence in support of termination under Section 2511(b), our Supreme Court has stated as follows:

> [I]f the grounds for termination under subsection (a) are met, a court "shall give primary consideration to the developmental, physical and emotional needs and welfare of the child." 23 Pa.C.S. § 2511(b). The emotional needs and welfare of the child have been properly interpreted to include "[i]ntangibles such as love, comfort, security, and stability." In **In re E.M.**, 620 A.2d [481, 485 (Pa. 1993)], this Court held that the determination of the child's "needs and welfare" requires consideration of the emotional bonds between the parent and child. The "utmost attention" should be paid to discerning the effect on the child of permanently severing the parental bond.

**In re T.S.M.**, 71 A.3d 251, 267 (Pa. 2013) (some citations omitted).

Nonetheless, the mere existence of a bond or attachment of a child to a parent will not necessarily result in the denial of a termination petition, as "[e]ven the most abused of children will often harbor some positive emotion towards the abusive parent." **Id.** (citation omitted). Further, "[t]he continued attachment to the natural parents, despite serious parental rejection through abuse and neglect, and failure to correct parenting and behavior disorders which are harming the children cannot be misconstrued as bonding." **Id.** (citation omitted).

As this Court has noted, "a parent's basic constitutional right to the custody and rearing of his . . . child is converted, upon the failure to fulfill his . . . parental duties, to the child's right to have proper parenting and fulfillment of [the child's] potential in a permanent, healthy, safe environment." *In re B.,N.M.*, 856 A.2d 847, 856 (Pa. Super. 2004) (citations omitted).

Nonetheless, "[w]hen examining the effect upon a child of severing a bond, courts must examine whether termination of parental rights will destroy a 'necessary and beneficial relationship,' thereby causing a child to suffer 'extreme emotional consequences.'" *In re Adoption of J.N.M.*, 177 A.3d 937, 944 (Pa. Super. 2018) (citation omitted). "In the case of an unhealthy bond, 'attention must be paid to the pain that inevitably results from breaking a child's bond to a biological parent, even if that bond is unhealthy, and we must weigh that injury against the damage that bond may cause if left intact.'" *Id.* (quoting *T.S.M.*, 71 A.3d at 267).

Here, the trial court addressed Child's best interests as follows:

Based on the evidence, this [c]ourt determined that [Child] would not suffer any irreparable harm if Father's parental rights were terminated. After spending several weeks in the NICU on morphine maintenance, [Child] was discharged from the hospital. She was placed in her current kinship home, where she has resided since then. There was compelling testimony presented at the TPR hearing that [Child] is not bonded with Father and has no parent-child relationship with him. Father's visits with [Child] were to be supervised weekly at the agency for one hour, and his visits have never progressed further throughout the duration of the case. Additionally, Father has been inconsistent with visitation, attending only about a quarter of his visits with [Child]. This has impacted Father's relationship with [Child]. Mr. Kipp testified that [Child] does not recognize Father as a source of

comfort. By failing to fully comply with his single case plan objectives, Father has demonstrated that he is not interested in maintaining a parent-child relationship with [Child]. In determining the best interest of the child, this [c]ourt must consider both the needs and welfare of the child such as love, comfort, security, and stability. [Child] does not look to Father to meet these needs. [Child's] kinship family, however, does provide [Child] with love, support, care, comfort, and stability. [Child] looks to her kinship parents to meet her basic needs. Mr. Kipp testified that [Child] is bonded with her kinship family, is very happy in the home, and has lived there her entire life except when she was hospitalized. Additionally, the kinship parents' home is a pre-adoptive home and [Child] lives there with her siblings.

Clear and convincing evidence was presented to establish that there would be no irreparable harm caused to [Child] if this [c]ourt terminated Father's parental rights. For these reasons, this [c]ourt properly found that it would be in the best interest of [Child] to grant DHS's petition to terminate the parental rights of Father pursuant to [Section] 2511(b).

Trial Ct. Op. at 15-16.

Based on our review of the record, we discern no basis to disturb the trial court's conclusion that termination of Father's parental rights would best serve Child's needs and welfare. *See T.S.M.*, 71 A.3d at 267. The trial court credited Mr. Kipp's testimony that Father and Child do not share a healthy bond and that Child would not suffer irreparable harm if Father's parental rights were terminated. *See* N.T. Termination Hr'g at 29-30. The trial court also referred to Mr. Kipp's testimony that a bond existed between Child and her kinship caregivers. Mr. Kipp recommended that Child be adopted by the kinship caregivers because "she's with a loving family who has taken very well care of her for the past two years. She's been there her whole life." *Id.* Indeed, Mr. Kipp testified that Child is in a pre-adoptive home and that, at the

- 15 -

age of two, the foster parents are the only parents she has known. *Id.* at 33, 35. Child shares a bond with her kinship parents and that their relationship is "very good. She goes to- she refers to them for comfort. She's comfortable with everybody in the family. She's happy. She's on a schedule. You know, I've seen them putting her down for naps, picking her up from naps, giving- feeding her. To her, that's her family." *Id.* At 33. Further, this Court has stressed that "a child's life cannot be held in abeyance while a parent attempts to attain the maturity necessary to assume parenting responsibilities." *Interests of D.R.-W.*, 227 A.3d 905, 914 (Pa. Super. 2020) (citation omitted and formatting altered).

For these reasons, we discern no abuse of discretion by the trial court in applying Section 2511(b). *See S.P.*, 47 A.3d at 826-27. Clear and convincing evidence supports the trial court's conclusion that termination of Father's parental rights would best serve Child's developmental, physical, and emotional needs and welfare. *See R.N.J.*, 985 A.2d at 276. Accordingly, we affirm.

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 2/1/2022