J-S29031-24

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| IN RE: ADOPTION OF: R.J.H., A MINOR | : : : : : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: J.A.W., MOTHER | : : : : : : : : : | No. 478 WDA 2024 |

Appeal from the Order Entered March 27, 2024
in the Court of Common Pleas of Westmoreland County
Orphans' Court Division at No. 96 of 2023

BEFORE: DUBOW, J., KING, J., and BENDER, P.J.E.

MEMORANDUM BY BENDER, P.J.E.: **FILED: September 12, 2024**

J.A.W. (Mother) appeals from the order involuntarily terminating her parental rights to R.J.H. (Child). Upon review, we affirm.[1]

Child was born in December 2018, and has been in the care of the Westmoreland County Children's Bureau (WCCB or Agency) since November 2021. The trial court explained:

The factual history of this case began with the WCCB assuming emergency custody of the Child on November 18, 2021. The safety concerns preventing the Child from remaining in the home of Mother and Parent were drug-related, in that Mother and Parent were suspected of using illicit substances in the home as well as taking the Child to drug deals and executing drug deals in the home. The Child was adjudicated dependent following a hearing

---

[1] The trial court also terminated the parental rights, upon consent, of Child's birth father, D.I.Z. (Father), and putative parent, C.L.H. (Parent). *See* N.T., 1/10/23, at 11; N.T., 3/14/23, at 72. Neither Father nor Parent have appealed.

on December 14, 2021[,] and has remained in placement since that time.

Trial Court Opinion (TCO), 5/8/24, at 3.

On October 31, 2023, the Agency petitioned to terminate Mother's parental rights under 23 Pa.C.S. § 2511(a)(2), (8) and (b). The trial court held a hearing on March 14, 2024. The Agency presented witness testimony from Jean DeFilippis, the owner of ARCPoint Labs; Carol Patterson, an expert in parental capacity and bonding assessment; Meg Ferguson, a therapist and behavior specialist; and Mary Nicholson, the Agency caseworker. Mother did not appear and did not present any witness testimony. Her counsel stated:

> We're going to proceed. Mother is not present. We're aware of the order of the court and the discussions at the [last hearing about Mother] be[ing] here … and she has just authorized [] me to proceed … in her absence and to … carry on and do what we can.

N.T., 3/14/24, at 4-5. The trial court subsequently explained:

> The hearing concluded with no testimony being offered in Mother's case in chief, as she failed to attend the hearing, despite stating to her counsel that she would attend to defend against the WCCB's request to terminate parental rights.

TCO at 4.[2]

_____

[2] Mother did not appear at the prior hearing on January 10, 2024, where Mother's counsel indicated she "did not have transportation to court this morning." N.T., 1/10/24, at 3. The Agency's counsel objected to continuing the hearing because Mother had "a habit of phoning it in." **Id.** The trial court noted Mother "has a habit of not showing up," but continued the hearing, stating that it was giving Mother "one opportunity" and "there will be no [further] continuances." **Id.** at 5. The trial court advised counsel that if Mother "doesn't show up [next time], we're going to proceed without her." **Id.**

Thereafter, the trial court terminated Mother's parental rights pursuant to 23 Pa.C.S. § 2511(a)(2), (8) and (b). Mother timely filed a notice of appeal and concise statement of errors pursuant to Pa.R.A.P. 1925(a)(2)(i).

Mother raises the following issues for review:

I. Whether the [h]onorable [t]rial [c]ourt erred in finding by clear and convincing evidence that the [Agency] met its burden as to terminating the parental rights of Mother under 23 Pa.C.S. § 2511(a)(2).

II. Whether the [h]onorable [t]rial [c]ourt erred in finding by clear and convincing evidence that the [Agency] met its burden as to terminating the parental rights of Mother under 23 Pa.C.S. § 2511(a)(8).

III. Whether the [h]onorable [t]rial [c]ourt erred in finding by clear and convincing evidence that the [Agency] met its burden under 23 Pa.C.S. § 2511(b) that the best interests of the Child are met by terminating Mother's parental rights.

Mother's Brief at 4.

In termination cases, the petitioner must prove by clear and convincing evidence that its asserted grounds for termination are valid. *In re R.N.J.*, 985 A.2d 273, 276 (Pa. Super. 2009). We have explained:

Where the trial court's factual findings are supported by the evidence, an appellate court may not disturb the … ruling unless it has discerned an error of law or abuse of discretion.

An abuse of discretion does not result merely because the reviewing court might have reached a different conclusion or the facts could support an opposite result. Instead, an appellate court may reverse for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. This standard of review reflects the deference we pay to trial courts, who often observe the parties first-hand across multiple hearings.

***Interest of M.E.***, 283 A.3d 820, 829-30 (Pa. Super. 2022) (citations and quotation marks omitted). "[U]nlike trial courts, appellate courts are not equipped to make the fact-specific determinations on a cold record, where the trial judges are observing the parties during the relevant hearing and often presiding over numerous other hearings regarding the child and parents." ***In re S.P.***, 47 A.3d 817, 826 (Pa. 2012) (citation omitted).

Section 2511 of the Adoption Act provides for the termination of parental rights and a bifurcated analysis. First, the trial court must consider the parent's conduct and the enumerated grounds set forth in Section 2511(a). ***Id.*** at 830. If the court finds grounds for termination under Section 2511(a), it must assess evidence of the child's needs and welfare under Section 2511(b), "giving primary consideration to the developmental, physical and emotional needs and welfare of the child." ***In re T.S.M.***, 71 A.3d 251, 267 (Pa. 2013). This Court "need only agree with [the] decision as to any one subsection of [Section 2511(a), in addition to Section 2511(b),] to affirm the termination of parental rights." ***In re B.L.W.***, 843 A.2d 380, 384 (Pa. Super. 2004) (*en banc*).

*Section 2511(a) Grounds for Termination*

Here, we examine the trial court's termination of Mother's parental rights under subsection 2511(a)(2), which provides for termination when:

> The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for h[er] physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

23 Pa.C.S. § 2511(a)(2). The petitioner must prove the parent's "(1) repeated and continued incapacity, abuse, neglect or refusal; (2) that such incapacity, abuse, neglect or refusal caused the child to be without essential parental care, control or subsistence; and (3) that the causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied." *In re A.H.*, 247 A.3d 439, 443 (Pa. Super. 2021) (citation omitted). These grounds "are not limited to affirmative misconduct, but concern parental incapacity that cannot be remedied." *Id.*

Mother argues the trial court improperly terminated her parental rights under subsection 2511(a)(2) because "at an earlier point in this case, … Mother established that she is capable of parenting." Mother's Brief at 19. Mother states:

> For some reason, [Mother] stumbled … during the middle part of 2022. However, there is no reason that Mother cannot go back to her high level of progress that she had shown during the earlier part of these proceedings.
>
> ***
>
> During this positive stretch[,] … she was very consistent with visits, attending eighty-two of one hundred six visits during that period.
>
> In her testimony, Ms. DeFilippis, owner of the drug testing company engaged by the Agency, confirmed that Mother was testing negative during the time period when she was making all that progress, in the early to mid-part of 2022.
>
> ***
>
> After a short absence, Mother attempted to reestablish visits, but the Agency refused her requests. It was not until Ms. Nicholson came into the case on June 1, 2023, that visits were restored. However, at that point, the Agency's approach was simply for the

visit supervisor to observe and to assist the Child if she had any issues arise. No hands-on parenting, reunification attempts, or family counseling were offered when visits were restarted in July, 2023.

Given that Mother has shown good stretches where she can successfully parent the Child, the Agency has failed to meet its burden of establishing that Mother cannot or will not be able to parent the Child.

*Id.* at 20-23.

Mother's argument is unsupported by the law and facts, which indicate that Mother has been incapable of providing Child with essential care throughout this case. *In re A.H.*, *supra*. As the Agency observes, Mother failed to remedy the circumstances which led to Child's placement. Agency's Brief at 6.[3] The witnesses testified that Mother failed to overcome her drug use, mental health issues, and lack of stable housing. *See* TCO at 3-4. The trial court explained:

Testimony from WCCB Caseworker Mary Nicholson indicated that the WCCB offered Mother services to address her drug and alcohol issues prior to assuming custody [of Child] for a period of approximately five months. Mother participated in a drug and alcohol evaluation as recommended, but she failed to follow through with any treatment. From February 2021 until the date of the hearing, Mother had been directed to participate in random drug screens through ARCPoint Labs. Jean DeFilipis, owner of ARCPoint Labs, testified that Mother had submitted to 110 drug tests during that time and was positive for non-prescription substances on 93 occasions. Her most recent positive screen took place on August 23, 2023, at which time she tested positive for cocaine. Following that date, Mother became unavailable to submit to testing. Mother was also ordered to treat for her mental

---

[3] Child's guardian *ad litem* and legal counsel has joined the Agency's brief, and advised that counsel, on behalf of Child, "will not be submitting an independent brief for consideration." Letter, 7/2/24, at 1.

health issues, but the WCCB has never received record of any such treatment taking place. Mother did complete parenting instruction but has never had unsupervised time with the Child since [Child] came into [A]gency custody. Ms. Nicholson testified that Mother has not seen the Child in person since August 23, 2023.

*Id.* at 3. The trial court further observed that Ms. Nicholson "maintained Mother had not made progress toward addressing the addiction or mental health issues that led the Child to be placed," and "Dr. Patterson echoed these same concerns, testifying that Mother's untreated issues would hinder her parenting abilities." *Id.* at 5.

The record supports the trial court's findings. For example, Ms. Nicholson testified that during Child's 27 months with the Agency, Mother's issues involving mental health, drugs and alcohol, stable housing, and visiting Child, remained "unresolved by [M]other." N.T., 3/14/24, at 74, 86. Ms. Nicholson opined that the unresolved issues caused Mother to be unable to care for Child. *Id.* at 86. Similarly, Ms. Patterson testified that Mother's "current mental health status; her moderately elevated life stress; the parenting concerns; as well as the continuing drug and alcohol issues … all combine to place [Mother] at high risk in regard to her ability to parent [Child]." *Id.* at 25. Thus, the trial court did not err or abuse its discretion in terminating Mother's parental rights under subsection 2511(a)(2).

*Section 2511(b) Needs and Welfare*

Mother also asserts the Agency failed to prove that her rights should be terminated under Section 2511(b). When the trial court finds grounds for

termination under Section 2511(a), it must then consider the child's needs and welfare.

> The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child.

23 Pa.C.S. § 2511(b).

Intangibles "such as love, comfort, security, and stability are involved in the inquiry into the needs and welfare of the child." *In re C.M.S.*, 884 A.2d 1284, 1287 (Pa. Super. 2005) (citation omitted). The trial court must "discern the nature and status of the parent-child bond, with utmost attention to the effect on the child of permanently severing that bond." *Id.* (citation omitted). The Supreme Court has instructed that "courts considering termination must also consider whether the child[ is] in a pre-adoptive home and whether they have a bond with their foster parents." *In re T.S.M.*, 71 A.3d at 268.

Child has resided with her pre-adoptive foster parents continuously since November 2021. *See* N.T., 3/14/23, at 32. Mother argues "there are numerous factors that may make retaining the relationship between Mother and the Child an important and beneficial thing to do in this case." Mother's Brief at 27. Referencing the testimony of the attachment expert, Ms. Patterson, Mother asserts:

> The strengths noted by [Ms.] Patterson show there is something in the relationship between Mother and Child that is worth saving. Ms. Patterson noted numerous attempts at affectionate behavior directed from Mother toward the Child, and also noted that Mother used several teaching opportunities for the benefit of the Child.

***

Ms. Patterson had concluded that if there never was a bond between Mother and Child, it would be very difficult or impossible to establish such a bond now. However, Ms. Patterson conceded that since it has been over two years since Child was removed from Mother's home, Ms. Patterson was not in a position to say whether a bond ever existed between Mother and Child. Based on the same, Ms. Patterson could not conclude that it would not be possible for a bond between Mother and Child to be re-established at this point.

***

Given that the Child still referred to Mother as "Mama," given that she said "maybe mommy can come visit me at the foster home," and given that interactional services could have been helpful but were not initiated in July, 2023, the Agency failed to meet its burden of establishing that there would be no beneficial attachment or bond that would be lost if the Child is forever separated from Mother.

*Id.* at 27-29.

Again, the record does not support Mother's argument. The Agency accurately observes there "is no evidence to show that any necessary and beneficial bond exists between Mother and Child[.]" Agency's Brief at 20. The Agency states, "[i]t was made clear, after the testimony of the[] expert witnesses, that the emotional, physical and developmental interests of Child would best be served by allowing Child to remain with her [f]oster [p]arents to allow for Child to be provided permanency following nearly three years of remaining in foster care." *Id.*

As the trial court explained:

On [August 23, 2023], Mother and Child participated in a bonding assessment performed by psychologist [Ms.] Carol Patterson.

- 9 -

[Ms.] Patterson reported that, based upon her evaluation of Mother on an individual basis, she exhibited a number of concerns that would affect her parenting ability, including her untreated mental health issues, her drug and alcohol issues, her stress level, and untreated childhood trauma issues. During the observation of Mother's interactions with the Child, [Ms.] Patterson noted that Mother did not provide much structure for the Child and was inconsistent with rules and boundaries for the Child. [Ms.] Patterson also noted that Mother appeared to be unable to deal with the Child's behavioral issues. By contrast, [Ms.] Patterson observed the foster parents interacting with the Child and witnessed a markedly different bond. The Child included the foster parents in the various activities that she initiated and was well-behaved. The foster family provided structure to the period of play and were consistent with the rules and boundaries for the Child. Based upon her observations, [Ms.] Patterson concluded that the foster family is able to meet the developmental, emotional and physical needs of the Child and that severing the parental relationship between Mother and the Child would not be detrimental to the Child's development.

TCO at 3-4.

The record supports the accounts of the Agency and trial court. Ms. Patterson testified to performing the "parental capacity and bonding and attachment assessment." N.T., 3/14/24, at 18. She assessed Mother and Child, as well as Child and foster parents. *Id.* at 19, 25. According to Ms. Patterson, Child "was kind of not sure about being with [M]other," but referred to Mother "as mama on one occasion, and [Child] included [M]other in a couple activities[.]" *Id.* at 26. Further:

When [M]other approached [Child], [Child] had many negative responses. … She had no reply when [M]other said, I missed you. She had no response to [M]other kissing her on the cheek.

[Child] backed away when [M]other reached out to touch her.

\*\*\*

- 10 -

[Child] left [M]other when [M]other gave her a hug and kiss. She had no reply to [M]other's question, what are you making?

[Child] changed [M]other's arrangement at the play kitchen, and she got away from a hug [M]other gave her.

\*\*\*

[Child] erased all of [M]other's drawings while laughing. She pushed the magnet board onto [M]other's arm.

[Child] tried to close the door of the playroom on [M]other and said bye-bye. She threw a toy across the room.

*Id.* at 27-28. Ms. Patterson stated that Child "initiated one affectionate" gesture toward Mother, but had no problem leaving her. *Id.* at 29.

With foster parents, Ms. Patterson observed Child to be "very happy [and] smiling." *Id.* at 33. In addition:

[Child] included foster parents in all of the activities that she initiated. She initiated affectionate behavior towards them.

[Child] responded positively to [foster parents'] approaches towards her. She was compliant with all of their requests, and she did not display any behavioral issues.

[F]oster parents utilized all of the factors that [Ms. Patterson] was assessing in regard to caring for [Child].

They established structure for her. They utilized many teaching opportunities with her. They positively reinforced her efforts and successes.

They saw to her needs. They had rules and boundaries in place for her, and there were no safety issues present, and they also indicated that the observations that I saw were typical for them and [Child].

*Id.* at 34.

Ms. Patterson concluded that Child "displayed no bond or attachment" with Mother, and "displayed a strong, secure bond and attachment with her

foster parents." *Id.* at 35. The trial court referenced this testimony, and the testimony of Ms. Ferguson and Ms. Nicholson, in concluding that termination was best for Child's needs and welfare. *See* TCO at 7 (trial court stating that termination "would establish an attainable end to the uncertainty that has characterized [Child's] life for the past two and half years"). Therefore, the trial court did not err or abuse its discretion in terminating Mother's parental rights pursuant to Section 2511(b).

Order affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

DATE: 09/12/2024