J-A13042-25

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| IN RE: ADOPTION OF: B.L.D., A MINOR CHILD | : : : : : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: J.P., MOTHER | : : : : : : : | |
| | : | No. 1511 WDA 2024 |

Appeal from the Order Dated November 5, 2024
In the Court of Common Pleas of Washington County
Orphans' Court at OC-2024-00761

BEFORE:  BOWES, J., OLSON, J., and BENDER, P.J.E.

MEMORANDUM BY BENDER, P.J.E.:                **FILED: May 29, 2025**

J.P. (Mother) appeals from the order granting the petition of Washington County Children and Youth Services (the Agency) and terminating her parental rights to B.L.D. (Child).[1]  We affirm.

<u>CASE HISTORY</u>

Child was born in January 2016.  The Agency became involved with the family in February 2023, "after receiving a referral concerning parental substance abuse."  Orphans' Court Opinion (OCO), 11/5/24, at 1.  The referral occurred after Father and Child were in a car accident.  **Id.**  The orphans' court explained:

> Mother arrived on the scene while the Trooper was conducting field sobriety tests on Father, and the Trooper observed Mother walking in the middle of the road without shoes or socks.  The

---

[1] The orphans' court also terminated the parental rights of Child's father, R.D. (Father).

Trooper noted Mother was in a "panicked state and was rambling," and demanding to see the Trooper's badge number and name. Mother was directed by the Trooper to check on Child in the ambulance, as Mother had not yet done so. …

[Child was transported to] the hospital to be evaluated … for a leg injury. …

The Agency responded to the referral … by dispatching a caseworker to meet with the family at the hospital. Drug screens conducted at the hospital [showed] Father tested positive for Amphetamines and Suboxone[,] and Mother tested positive for Amphetamines, Methamphetamines, and Suboxone. Both parents did not dispute these results and informed the caseworker that they are both prescribed Adderall, Gabapentin, and Subutex.

While at the hospital, both parents were verbally aggressive, uncooperative, engaging in erratic behavior, and were yelling at each other, hospital staff, and the Agency.

*Id.* at 2-3 (citations and footnote omitted).

On March 16, 2023, Child was adjudicated dependent and placed in the pre-adoptive foster home of her maternal aunt and uncle, who are Mother's sister and brother-in-law (Foster Parents). *Id.* at 4-5. The court established a permanency plan for Mother which required her to: complete a parenting program; participate in domestic violence counseling; participate in drug and alcohol treatment; submit to random drug tests; maintain sobriety; and maintain stable housing. *Id.* at 4 n.3. The court also ordered Mother "to participate in individual and interactional evaluations with [Child] conducted by Dr. Neil Rosenblum, a clinical psychologist." *Id.*

Mother failed to comply with the permanency plan, and Child has remained in the care of Foster Parents. In March 2024, the Agency petitioned to change Child's permanency goal from reunification to adoption. *Id.* at 5.

Following a hearing on April 25, 2024, the court changed Child's permanency goal from reunification with a concurrent goal of adoption, to adoption with a concurrent goal of permanent legal custodianship.  Order, 4/25/24, at 2.

On May 15, 2024, the Agency petitioned to terminate Mother's parental rights pursuant to 23 Pa.C.S. §§ 2511(a)(1), (2), (5), (8), and (b).  The orphans' court held a hearing on October 2, 2024.  The Agency presented testimony from Dr. Rosenblum, Agency caseworker Justin Faloshey, and Child's uncle/Mother's brother-in-law (Foster Father).  Mother and Father testified in opposition to termination.  At the conclusion of the hearing, Child's guardian *ad litem* opined that the Agency had "met their burden of proof and the parental rights should be terminated based on all of the testimony and evidence that's been presented today."  N.T., 10/2/24, at 286.  Child's legal counsel "echo[ed] the guardian *ad litem*'s statement," and opined that Mother was not "able to remedy the circumstances that led to placement."  **Id.**  Child's counsel added that Mother had "shown an inability to remedy the circumstances in the future."  **Id.**

On November 5, 2024, the court issued an order and opinion terminating Mother's parental rights.  Mother filed a timely notice of appeal and Pa.R.A.P. 1925 concise statement on December 4, 2024.  On December 31, 2024, the orphans' court filed an order referring this Court to the opinion it issued with the termination order.

Mother presents the following questions for review:

1. Did the [orphans'] court commit an abuse of discretion and rule incorrectly in finding that clear and convincing evidence existed in terminating the parental rights of Mother pursuant to 23 Pa.C.S.[] §[§] 2511(a)(1), (a)(2), (a)(5), (a)(8)?

2. Did the [orphans'] court commit an abuse of discretion and error of law in terminating Mother's parental rights pursuant to 23 Pa.C.S.[] § 2511(b) in finding clear and convincing evidence existed that terminating the parental rights of Mother best serves the needs, welfare and best interest of [C]hild?

3. Did the [orphans'] court commit an abuse of discretion and error of law in allowing in and considering the hearsay testimony from out-of-court statements of Kristen Young in its decision to terminate the parental rights of Mother?

4. Did the [orphans'] court commit an abuse of discretion and error of law in allowing in and considering the hearsay testimony from out-of-court statements of Angie Geho in its decision to terminate the parental rights of Mother?

Mother's Brief at 9-10.

## ANALYSIS

As an appellate court, we accept the findings of fact and credibility determinations of the orphans' court if they are supported by the record. *See In the Int. of K.T.*, 296 A.3d 1085, 1097 (Pa. 2023). If the record supports the factual findings, we determine if the orphans' court made an error of law or abused its discretion. *Id.* A court's decision "should not be reversed merely because the record would support a different result." *Id.* (citations omitted). Our Supreme Court has emphasized deference to the orphans' courts "because they often have first-hand observations of the parties spanning multiple hearings." *Id.* (citations omitted). The Supreme Court further explained:

- 4 -

> [U]nlike [orphans'] courts, appellate courts are not equipped to make fact-specific determinations on a cold record, where [orphans' court] judges are observing the parties during the relevant hearing and often presid[ed] over numerous other hearings regarding the child and parents. Therefore, even where the facts could support an opposite result, as is often the case in dependency and termination cases, an appellate court must resist the urge to second guess the [orphans'] court and impose its own credibility determinations and judgment; instead we must defer to the [orphans' court] judges so long as the factual findings are supported by the record and the court's legal conclusions are not the result of an error of law or an abuse of discretion.

*In re Adoption of S.P.*, 47 A.3d 817, 826-27 (Pa. 2012) (citations omitted).

*Evidentiary Issues*

We begin by addressing Mother's third and fourth issues, which she describes as "connected to her first argument." Mother's Brief at 18. Mother claims the orphans' court improperly considered hearsay testimony from the Agency's casework manager, Kristen Young, and the family's former caseworker, Angie Geho. We review these claims first because an erroneous evidentiary ruling which affects a termination decision "is not harmless," and entitles a parent "to a new hearing and decision." *In re A.J.R.-H.*, 188 A.3d 1157, 1170 (Pa. 2018) (citation omitted).

"[T]he decision of whether to admit or exclude evidence is within the sound discretion of the orphans' court." *Id.* at 1166-67. This Court will not disturb the orphans' court's evidentiary ruling unless it has abused its discretion — *e.g.*, when it has overridden or misapplied the law. *Id.* at 1167. Hearsay is a statement made out of court and offered to prove the truth of the matter asserted; it is not admissible unless it meets a statutory exception.

***See*** Pa.R.E. 801(c), 802. Here, we cannot conclude that statements by Ms. Young and Ms. Geho were improperly admitted to prove the truth of any matter pertaining to Mother.

Ms. Young and Ms. Geho were involved in the dependency proceedings, but did not appear at the termination hearing. Their statements were included in "certified copies of the court orders and filings" from the dependency case, which the Agency sought to admit at the termination hearing. N.T. at 102. Mother's counsel objected to the admission of the dependency documents based on relevance. *Id.* at 103.[2] The Agency countered that the documents were "highly relevant." *Id.* at 104. The Agency argued:

> [C]hild was adjudicated dependent and removed from [Mother's] care pursuant to the dependency action….
>
> At the adjudication, [Mother was] given, in writing and verbally, the information and guidelines [she] needed in order to reunify with [C]hild. And [this exhibit] documents the court's findings throughout the dependency case … and is the reason we are here today.

***Id.***[3]

---

[2] The orphans' court asked Mother's counsel, "Respectfully, you're saying my orders and my colleagues' orders are not relevant to this proceeding?" ***Id.*** Counsel responded, "It's a separate case, Your Honor. And so that's what my position would be. Yes." ***Id.***

[3] Child's guardian *ad litem* and legal counsel both expressed agreement with the Agency. ***Id.*** at 105.

The orphans' court admitted the documents, marked as Exhibit 4, explaining that they "form the foundation of why the goal change was granted and why we are here today.  So I will accept them." *Id.* at 105.

Regarding Ms. Young, Mother asserts that the orphans' court impermissibly relied on "the alleged testimony of a one Kristen Young" in its opinion.  Mother's Brief at 33 (citing OCO at 12).  Mother concedes that Ms. Young's "testimony was not discussed or raised by the Agency in its case in chief during the termination matter." *Id.* at 34.  Nonetheless, she asserts:

> The [orphans'] court appears to have included this statement from a dependency court matter that was admitted *en masse* by the Agency over Mother's objections, despite such introduction of evidence being prohibited under Pennsylvania law. *In re: A.J.R.-H.*, [188 A.3d at 1167].  [W]hile hearsay statements are sometimes permitted in dependency hearings, they are not permitted in termination matters.  The Agency's *en masse* introduction of the dependency orders over Mother's objections allowed the Agency to circumvent the rules governing the introduction of such statements, and it was an error for the [orphans'] court to allow that.

*Id.*

Mother's reliance on *In re A.J.R.-H.* is not persuasive.  In that case, the Pennsylvania Supreme Court held documentary evidence contained in 167 exhibits was inadmissible under the business records exception to the hearsay rule.  The Supreme Court explained, "No witness stated that [they were] able to speak to the mode of … the documents' preparation, testify that the documents were created at or near the time of the documented event or conversation, or made in the regular practice of the activity involved." *In re*

***A.J.R.-H.***, 188 A.3d at 1169 (citing Pa.R.E. 803(6)). In addition, the Supreme Court repeatedly observed that "none of the documents were certified copies." ***Id.*** at 1167-69 (citing Pa.R.E. 803(6)(D) (providing that documents certified pursuant to Pa.R.E. 902(11) or (12) are "not excluded by the rule against hearsay, regardless of whether the declarant is available as a witness") and Pa.R.E. 902(11) (providing that records are self-authenticating if the original or copy meets the requirements of Rule 803(6)(A)-(C) (exceptions to the rule against hearsay)). Here, the documents were properly certified. ***See*** N.T. at 103 (orphans' court advising Mother's counsel that the documents were certified as evidenced by a stamp and raised seal).[4]

Also, ***In re A.J.R.-H.*** involved 167 exhibits, while Mother challenges one exhibit, which contains the following filings:

> 1) Order Confirming Emergency Protective Custody; 2) Shelter Care Application; 3) Shelter Care Order; 4) Dependency Petition; 5) Order of Adjudication and Dependency; 6) Order correcting docket to accurately reflect Child's birthdate; 7) Permanency Review Order dated 6/22/23; 8) Order continuing permanency review hearing to 8/22/23; 9) Order continuing permanency review hearing to 8/30/23; 10) Permanency Review Order dated 8/30/23; 11) Agency's Status Report; 12) Mother's Status Report; 13) Permanency Review Order dated 12/19/23; 14) Permanency Review Order dated 4/25/24; 15) Order scheduling goal change hearing; 16) Mother's request for a hearing before a judge; 17) Order scheduling hearing before a judge; and 18) order scheduling a permanency review hearing for 11/14/24.

_____

[4] Our review confirms that each of the 18 filings which comprise Exhibit 4 were individually certified and bear a stamp, raised seal, and signature of the Washington County Juvenile Court Clerk.

Exhibit 4.

Even if the orphans' court erred, the error would be harmless. ***In re***

***A.J.R.-H.***, 188 A.3d at 1175 (an evidentiary error in termination cases is

harmless if it "could not have had any impact upon the orphans' court's

decision"). The orphans' court referred to Ms. Young only once in its opinion,

and the reference pertained to Father. ***See*** OCO at 12. The court stated:

> Father's testimony in the [termination] proceeding focused on shifting blame onto the Agency for removing [Child] from his home; his testimony rambled about how [the Agency] did not have the evidence or authority to remove [Child]. This was also the case at the permanency review hearings. Kristen Young, a casework manager with the Agency, testified that Father has made several accusations about the Agency to her through text messages. In one such accusation, Father indicated that he believed the Agency may have been responsible for altering his vehicle's axle to cause the accident.

***Id.*** at 11-12 (citing Permanency Review Order, 8/30/23, at 4). As the Agency

observes, Ms. Young's statement "dealt solely with Father" and does not

involve Mother. Agency's Brief at 38.

With respect to Ms. Geho, Mother argues:

> [I]n [the] case in chief presented by the Agency at the termination hearing, and in the [OCO], numerous references were made to statements made by previous caseworker Angie Geho, who was the caseworker for the majority of the dependency matter prior to the termination filing…. Over Mother's objections, these statements were allowed to be introduced, both through witness testimony at [the termination hearing], and in the dependency court orders that were erroneously admitted *en masse*, and used to introduce hearsay statements by Ms. Geho at [the termination hearing].

Mother's Brief at 35.

As with Ms. Young, we cannot conclude that the orphans' court improperly relied on hearsay from Ms. Geho in terminating Mother's parental rights. The court mentioned Ms. Geho once when discussing Father. ***See*** OCO at 12 (orphans' court stating, "Father accused the family's caseworker at the time, Ms. Geho, as having burned his vehicle") (citing Permanency Review Order, 8/30/23, at 3). Mother does not explain how statements by Ms. Geho influenced the court's decision to terminate Mother's parental rights. Also, as the Agency points out, "the overwhelming bulk of the testimony" about Ms. Geho came from Mother and Father, who "blame [Ms. Geho] for their failure to complete court-ordered services rather than take personal responsibility for such." Agency's Brief at 40-41; ***see also*** N.T. at 188-89, 250-52 (Mother testifying that Ms. Geho "blocked my number" and "has never been at my house or tried to get ahold of me"); ***id.*** at 253 (Mother stating Ms. Geho "just d[id]n't answer"); ***id.*** at 254 (Mother claiming she received "a message [from Ms.] Geho saying, 'You need to get off the Subutex or you don't get your daughter back. She will be adopted.'"); ***see also id.*** at 255-58, 271, 274.

For the above reasons, Mother's evidentiary claims lack merit. Accordingly, we consider her claims that the orphans' court erred and abused its discretion in terminating her parental rights under the Adoption Act.

*Section 2511(a) Grounds for Termination*

Mother asserts that the orphans' court erred in finding statutory grounds for termination pursuant to Section 2511(a). The Adoption Act provides for a bifurcated analysis. First, the court must consider a parent's conduct and the

grounds set forth in Section 2511(a). A petitioner must present clear and convincing evidence "that its asserted grounds for seeking the termination of parental rights are valid." *In re R.N.J.,* 985 A.2d 273, 276 (Pa. Super. 2009). The Superior Court "need only agree with [the] decision as to any one subsection of [Section 2511(a), in addition to Section 2511(b),] to affirm the termination of parental rights." *In re B.L.W.*, 843 A.2d 380, 384 (Pa. Super. 2004) (*en banc*). Here, we review the court's finding of grounds for termination under Subsection 2511(a)(2).[5]

> Subsection 2511(a)(2) provides for termination when:
>
> The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for h[er] physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

23 Pa.C.S. § 2511(a)(2). These grounds "are not limited to affirmative misconduct, but concern parental incapacity that cannot be remedied." *In re A.H.*, 247 A.3d 439, 443 (Pa. Super. 2021) (citation omitted). "Parents are required to make diligent efforts toward the reasonably prompt assumption of full parental duties." *Id.*

> Mother argues:
>
> [T]he trial court relied in its opinion in finding against [Mother] under [S]ubsection [2511](a)(2) that "[Mother has] a repeated and continued parenting incapacity and neglect based upon [her] substance abuse." [OCO at] 17. However, at the [termination]

---

[5] The orphans' court also found grounds for termination under Subsections 2511(a)(1), (5), and (8). *See* OCO at 25.

> hearing, the [orphans'] court sustained Mother's objections to drug test logs being admitted into the record as evidence. [N.T. at] 118. In finding clear and convincing evidence of Mother's alleged substance abuse under [S]ubsection [2511](a)(2) … without any drug testing logs or testimony from any witness with firsthand knowledge, the [orphans'] court committed an error of law and abuse of discretion….
>
> These errors … are compounded by the court's allowance in admitting *en masse* all of the dependency orders from the separate court matter that the Agency and the family had been involved in, as Agency [E]xhibit 4.

Mother's Brief at 28-29.

Again, Mother is not persuasive. As discussed above, the orphans' court did not err in admitting documents from the dependency record. In addition, the record as a whole supports the court's conclusion that Mother remained incapable of caring for Child because she did not progress "towards [her] permanency goals," and her incapacity "does not appear to be remediable in the near future." OCO at 13-14.

To satisfy Subsection 2511(a)(2), a petitioner must prove: "(1) repeated and continued incapacity, abuse, neglect or refusal; (2) that such incapacity, abuse, neglect or refusal caused the child to be without essential parental care, control or subsistence; and (3) that the causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied." *In re A.H.*, 247 A.3d at 442-43. In this case, the orphans' court relied on testimony from Dr. Rosenblum and Mr. Faloshey — as well as Mother — in terminating Mother's parental rights under Subsection 2511(a)(2). The court observed that the evidence demonstrated that Mother's failure to comply with her permanency

plan "includes, but is not limited to" Mother's substance abuse objectives.

OCO at 23. The court explained:

> [T]he record reflects that Mother … made no progress and [has had] no compliance with [her] permanency goals. Credible testimony … reveal[ed Mother has] not completed parenting education services, ha[s] failed to follow the recommendations of Dr. Rosenblum, and ha[s] failed to participate in drug and alcohol treatment and requested medication counts.
>
> … Dr. Rosenblum noted in his evaluations that "[b]oth parents seem to view themselves as 'functional addicts.'" *See* Agency Exhibit 5, [Psychological Evaluation, 5/26/23, at] 12. ... Clearly, substance abuse concerns continue…. That [Mother] has [not] taken any meaningful or proactive steps to remedy the circumstances of [Child's] removal, despite having nearly twenty months to have done so, is indicative of a continuing incapacity that does not appear to be remediable in the near future.
>
> ***
>
> Furthermore, Mother [does] not possess safe and stable housing, nor do[es she] have employment to provide for [Child]. Mother's testimony from the termination proceeding indicates that the parents are living out of Father's truck parked in the driveway of [Child's] maternal grandmother's home. Mother claims to have access to the amenities of the grandmother's house, and Mr. Faloshey, the family's current caseworker, testified that Mother is receiving benefits such as food stamps…. Nevertheless, Dr. Rosenblum credibly testified to the importance of emotional closure and permanence in [Child's] environment and stability in her home and community in order for her to continue to grow and develop. Currently, [Mother does not] possess[] the appropriate environment to be able to provide [Child] with the appropriate emotional and environmental stability necessary for her to grow and develop.

*Id.* at 14-15, 17 (some citations omitted).

Dr. Rosenblum evaluated Mother and Child toward the beginning of the case in May of 2023. He testified that Mother suffers from "longstanding

trauma" and "a constellation of concerning mental health difficulties," which include bipolar disorder, attention deficit hyperactivity disorder (ADHD), self-harm, and various phobias. N.T. at 35-36. He also expressed concern with Mother's history of opioid abuse. *Id.* at 38. Dr. Rosenblum prepared a 13-page report, with the recommendations for Mother's permanency plan, which the court admitted as Exhibit 5. *Id.* at 18-19.

Mr. Faloshey, the caseworker at the time of the termination hearing, did not begin working with the family until August of 2024. However, he testified to familiarizing himself with the case, including the history, timeline, and court orders. *Id.* at 168-69, 177. Mr. Faloshey stated that he "communicate[d] quite frequently" with Mother, and was persistent in calling and texting her. *Id.* at 172, 176.

Mr. Faloshey testified that Mother was not compliant with her permanency plan. *Id.* at 111. For example, she did not participate in a parenting program or substance abuse treatment. *Id.* at 112, 115. Mr. Faloshey explained that Mother's permanency plan required her to take her medication as prescribed, and submit to "pill counts" of her Adderall, Gabapentin and Suboxone. *Id.* at 125-26. She failed to do so. *Id.* at 127. Mr. Faloshey stated that Mother was "a no show for random [drug] testing." *Id.* at 122. According to Mr. Faloshey, a "no show urine is an illicit urine." *Id.* at 174. He explained that if Mother had "to present a urine screen and [w]as a no-show, then it's a presumptive … positive because you have to test." *Id.* at 227-28. Mr. Faloshey was unaware of Mother contacting the Agency to

request assistance with transportation to services. *Id.* at 121. He stated, "No one ever reached out to me for transportation." *Id.* at 174. Mr. Faloshey also noted that Mother was living in a pickup truck. *Id.* at 128. He said he "tried to build rapport" and "went to the truck to meet [Mother]" because he was concerned with how she and Father were managing. *Id.* at 165. He also testified that Mother continued to visit Child, although the visits remained supervised. *Id.* at 158-59.

Finally, Mr. Faloshey summarized Mother's participation in her permanency plan as "no progress" and "minimal compliance." *Id.* at 130. He testified that Mother had not remedied the circumstances that caused Child to be adjudicated dependent. *Id.* at 164. Mr. Faloshey observed that Child had "been in care for 19 months," and Mother "still has quite a bit to work on." *Id.* at 164-65.

When Mother testified, she acknowledged making "some bad decisions" which led to her losing custody of Child. *Id.* at 261. Mother further acknowledged her failure to comply with her permanency plan. She testified that she did not participate in mental health treatment because she was unable "to pay for it." *Id.* at 270. As to the parenting program, Mother stated that she did not participate because she was on a waiting list and was "not allowed to because apparently I haven't been 30 days clean." *Id.* at 250-51. Mother also confirmed she was ordered to participate in pill counts, and testified that she made efforts to comply with the order. *Id.* at 252-53. According to Mother, the Agency was not forthcoming with information, and

caused her to be unaware of when or how to participate in pill counts. *Id.* She also testified to having anxiety and a fear of going out in public. *Id.* at 255-56. Finally, Mother confirmed that she lacked housing, but stated that she "wouldn't be living in a truck" if she had custody of Child. *Id.* at 262.

The evidence supports the orphans' court's conclusion that Mother had "almost twenty months to comply with [her] goals," but "made no progress towards alleviating the circumstances which necessitated [Child's] removal." OCO at 12-13. The court specified that Mother "has continued parenting incapacity," that Child is "without essential parental control or subsistence necessary for [her] physical and mental well-being," and Mother "cannot or will not remedy this situation." *Id.* at 17; *see also In re A.H.*, 247 A.3d at 443 (recognizing that a parent is required to "make diligent efforts toward the reasonably prompt assumption of full parental duties"). Accordingly, the court did not err or abuse its discretion in terminating Mother's parental rights pursuant to Subsection 2511(a)(2).

*Section 2511(b) Needs and Welfare*

Mother claims the orphans' court erred in finding that termination of her parental rights was in Child's best interest pursuant to Section 2511(b). *See* OCO at 13. If the court finds grounds for termination under Section 2511(a), it must then "give primary consideration to the developmental, physical and emotional needs and welfare of the child." 23 Pa.C.S. § 2511(b). "Notably, courts should consider the matter from the child's perspective, placing her developmental, physical, and emotional needs and welfare above concerns for

- 16 -

the parent." ***In the Int. of K.T.***, 296 A.3d at 1105. A Section 2511(b) analysis includes consideration of a parental bond, including "a determination of whether the bond is necessary and beneficial to the child, *i.e.*, whether maintaining the bond serves the child's developmental, physical, and emotional needs and welfare." ***Id.*** at 1113. Our Supreme Court has instructed:

> The Section 2511(b) inquiry must also include consideration of other important factors such as: the child's need for permanency and length of time in foster care consistent with 42 Pa.C.S. § 6351(f)(9) and federal law[, the Adoption and Safe Families Act], 42 U.S.C. §§ 675(5)(C), (E); whether the child is in a preadoptive home and bonded with foster parents; and whether the foster home meets the child's developmental, physical, and emotional needs, including intangible needs of love, comfort, security, safety, and stability. These factors and others properly guide the court's analysis of the child's welfare and all her developmental, physical, and emotional needs. ***See*** [***In re***] ***T.S.M.***, 71 A.3d [251,] 268–69 [(Pa. 2013)] ("[T]he law regarding termination of parental rights should not be applied mechanically but instead always with an eye to the best interests and the needs and welfare of the particular children involved."). [Orphans'] courts have the discretion to place appropriate weight on each factor present in the record before making a decision regarding termination that best serves the child's specific needs.

***Id.*** (footnotes omitted).

Mother claims the orphans' court's analysis "was erroneous, as there had not been clear and convincing evidence to suggest termination of Mother's rights is consistent with the developmental, physical and emotional needs of [C]hild." Mother's Brief at 32. Mother emphasizes that the court must "consider the nature and status of [her] bond" with Child, and contends the court "erroneously cited alleged parental substance abuse in finding that

Mother could not provide [for Child's] developmental needs." *Id.* at 32-33. This argument is unconvincing.

The orphans' court recognized an "obvious bond that exists" between Child and Mother. OCO at 23. The court stated that it could not "discount that [Mother] care[s] very deeply for [Child] and [Child] is affectionate … in return. *Id.* However, the court found that the bond did "not rise to the level of 'necessary and beneficial' such that [Child] could suffer 'extreme emotional consequences' or 'significant, irreparable harm' if it were terminated." *Id.* (citing *K.T.*, 296 A.3d at 1109-10). The court noted "[c]redible testimony [which] demonstrates that [Mother] cannot provide for the developmental needs of [Child]." *Id.* at 23. The court stated:

> When viewed holistically, the record demonstrates that [Mother is] not capable of providing for [Child's] safety and security. [She is] currently unemployed and homeless[,] and ha[s] presented no testimony [as] to whether [she is] taking steps to remedy these conditions. As such[, Mother] cannot provide safe and stable housing [for Child]. Dr. Rosenblum testified that the lack of stable housing and homeless[ness] can have serious impacts on a child's socialization skills and creates instability. Furthermore, … substance abuse issues present a concern [for] the well-being of [Child]. No credible evidence has been presented to suggest that Mother … ha[s] maintained a clean and sober lifestyle. …
>
> [T]here [we]re credible concerns expressed by Dr. Rosenblum that [Mother was] neglecting [Child's] developmental needs. … The record indicates that [Mother] did little to promote [Child's] socialization skills and little to address her educational delays.

*Id.* at 24-25.

Further, the orphans' court found "the stability, safety, and developmental growth that [Child] is currently receiving with [F]oster

- 18 -

[P]arents and the bond that she has developed with them outweighs the loss that she may experience from the severance of parental rights." ***Id.*** at 25. The court described Foster Parents' home as "safe and stable," and found that Foster Parents provide Child "with support and love [and meet] her daily and developmental needs." ***Id.*** The court reasoned:

> [Child] has been in placement since February 28, 2023, and has resided with [F]oster [P]arents [since] March 16, 2023. Since that time, [Child] has greatly progressed in both her socialization and speech development. [Child] was enrolled in cheerleading, basketball, and dance to help foster her social development, as well as … camping and swimming over the summer. Dr. Rosenblum noted [Child] is doing well … and that [Foster Parents] often give [Child] praise, which [Child] responds well to. Additional testimony provided by [Foster Father] indicates [Child] has a good relationship with [F]oster [P]arents, that they are meeting her daily [needs,] as well as [her] medical, educational, and developmental needs, and that [Child] has developed a strong bond with [Foster Parents'] three-year-old daughter, whom [Child] refers to as her sister. [Foster Father] further testified that [Child's] emotional needs are being met as well, emphasizing that [Child] seeks out both [F]oster [P]arents for comfort and approval….

***Id.*** at 22-23 (citation omitted).

The record supports the court's reasoning. Dr. Rosenblum described Child as "very pleasant," although he noted that she lacked confidence. N.T. at 22, 26. He also testified that Child exhibited "rather severe articulation problems" and a "speech sound disorder." ***Id.*** at 21. He further observed that Child "displayed … a high degree of restlessness [and] being easily distracted … and presented with the likelihood of a possible ADHD diagnosis." ***Id.*** at 22. Dr. Rosenblum stated:

[Child's] diagnoses were [ADHD], predominantly inattentive type; unspecified trauma and stressor-related disorder; adjustment disorder with mixed disturbance of emotions and conduct; speech sound disorder; child affected by parental relationship distress; and parent/child relational problems.

*Id.* at 27.

Dr. Rosenblum expressed concern with Child "growing up in an unstable family environment." *Id.* at 27. He noted that when Foster Parents began caring for Child, her learning and social skills were delayed. *Id.* at 24. When he observed Child with Foster Parents, they provided "a lot of praise, a lot of encouragement." *Id.* at 25. Dr. Rosenblum stated that Child "responded particularly well to [Foster Mother's] direction and was very proud when Foster Parents worked with her, for example, on a puzzle. She had a big smile on her face." *Id.* at 25-26.

During the interactional evaluation with Mother, Dr. Rosenblum observed that she "is very attached" to Child. *Id.* at 30. However, he had "concerns about Mother's emotional state" and "pressured effect with rapid speech." *Id.* Dr. Rosenblum testified that Mother "became emotionally intense and unsettled at times and showed signs … consistent with bipolar disorder." *Id.* Dr. Rosenblum noted that Child "indicated that she loves her parents," although Child also referred to Foster Parents' daughter "as her sister." *Id.* at 22-23.

Mr. Faloshey testified that Foster Parents are an adoptive resource for Child. *Id.* at 161. He stated that Child and Foster Parents' daughter have "a great relationship with each other" and Child considers "her a sister." *Id.* at

160.  According to Mr. Faloshey, Child "is doing great" with Foster Parents. *Id.* at 162.  He stated that Foster Parents ensure Child's needs are met, and "both are very involved with [Child].  [Child] responds very well to them." *Id.* at 163.  Further, he relayed that he had "talked to [Child] about permanency recently, … and she is comfortable staying where she is." *Id.* at 161.  He reiterated that "she's good with that being her forever home." *Id.* at 182.  Mr. Faloshey opined that Child "deserves permanency[,] and I think [termination of Mother's parental rights] would be less traumatic [then reunification with Mother]." *Id.* at 165.

Foster Father testified that he is Child's uncle by marriage. *Id.* at 235.  He confirmed that he and Foster Mother are a pre-adoptive resource for Child. *Id.* at 238.  He also explained that he is supportive of Child regularly visiting with Mother. *Id.*  He described Child as "happy when she gets to go visit" Mother, although sometimes "there are some behavior issues" when Child returns. *Id.*  Foster Father stated:

> [Child] is progressing.  She's a lot better.  She had issues catching up at first, but she's doing a lot better.  …
>
> [Foster Mother] and I … read with her.  We help her with her math.  [We are] constantly trying to read with her, sound out her words because she had an [individualized education plan] for speech, so she couldn't pronounce words correctly or didn't understand the meaning of some of the words, so we help her with that.

*Id.* at 235-36.  Foster Father testified that Child enjoys cheerleading and dance classes, and described Child and his "three-year-old … all over the house dancing and just having a good time." *Id.* at 236-37.

The evidence supports termination of Mother's parental rights under Section 2511(b). Consequently, the orphans' court did not err or abuse its discretion in considering Child's needs and welfare and deciding that termination of Mother's parental rights was "in [Child's] best interest." OCO at 13.

Order affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

5/29/2025